622 A.2d 745

WASHINGTON SUBURBAN SANITARY COMMISSION

v.

CAE–LINK CORPORATION et al.

No. 52, Sept. Term, 1992.

Court of Appeals of Maryland.

April 8, 1993.

116

118

Richard J. Magid, William F. Ryan, Jr. (Whiteford, Taylor & Preston, both on brief), Baltimore, for petitioner.

David H. Bamberger (Leonard L. Gordon, Piper & Marbury, all on brief), Washington, DC, David L. Rutland, Annapolis, for respondent.

Argued before MURPHY, C.J., and RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, ROBERT M. BELL and CHARLES E. ORTH, Jr., (retired, specially assigned), JJ.

ROBERT M. BELL, Judge.

We granted certiorari to consider whether, as the Court of Special Appeals held, *CAE–Link Corp. v. WSSC*, 90 Md.App. 604, 602 A.2d 239, *cert. granted*, 327 Md. 304, 609 A.2d 312 (1992), the Washington Suburban Sanitary Commission ("WSSC"),[1] the petitioner, is strictly liable for nuisance as a result of its construction, and operation, of a sewage sludge composting facility pursuant to federal court orders.[2] This issue had its genesis in litigation, initiated in the United States District Court for the District of Columbia in 1973, to rectify an environmental crisis at the Blue

---

1. The Washington Suburban Sanitary Commission is a bi-county commission responsible for the water and sewage service for Montgomery and Prince George's Counties. *See* Md.Code (1957, 1990 Repl.Vol.) Art. 29, § 1–101 *et seq.*

2. According to the petitioner,
 The sludge is delivered from Blue Plains in sealed trucks. Upon arrival, the sludge is combined with wood chips, and formed into compost piles in the composting building. Air is drawn through the piles for approximately 21 days, after which time the wood chips are removed, and the remaining compost material is cured for 30 days. This results in a finished product which is sold for garden and landscaping uses under the trade name "ComPro."
 Petitioner's brief, p. 13. *See Electro–Nucleonics v. WSSC*, 315 Md. 361, 377–78, 554 A.2d 804, 812, *cert. denied*, 493 U.S. 854, 110 S.Ct. 158, 107 L.Ed.2d 115 (1989), for a more complete description of the operation.

Plains Sewage Treatment Plant, and in consent decrees, to which WSSC was a party, arising out of that litigation.[3]

Pursuant to an order entered by the United States District Court for the District of Columbia, Montgomery County reported that it would dispose of its share of the Blue Plains sewage sludge by building a composting facility on a large tract of undeveloped land adjacent to the Montgomery Industrial Park. Petitioner's brief p. 11. That undeveloped tract of land, which was on the Montgomery County—Prince George's County border, was known as Site 2.[4]

Subsequently, on July 10, 1978, the district court issued an order requiring the user jurisdictions to proceed to develop the designated sites. Montgomery County was ordered to have the Site 2 composting facility operational by July 1, 1979. WSSC thus was required to take all necessary action to accomplish that goal, including acquiring the land and obtaining the necessary permits.

Action by Prince George's County, which opposed development of a composting facility on Site 2, precipitated additional orders. The district court, on April 25, 1980, issued an order compelling WSSC to restore the funds caused to be removed by the WSSC Commissioners from Prince George's County and to move forward with the project. It issued a third order on June 27, 1980, in response to two state court suits filed by Prince George's

---

**3.** The history of the litigation and a detailed description of the various consent decrees is detailed in *United States v. District of Columbia*, 654 F.2d 802 (D.C.Cir.), *cert. denied, sub nom. Prince George's County v. United States*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981).

**4.** The court's order was issued after the inability of the parties, *i.e.* the District of Columbia, Fairfax County, Montgomery County, Prince George's County, the State of Maryland, and WSSC, to reach agreement on a permanent equitable plan for the disposal of sludge produced at the Blue Plains Sewage Treatment Plant resulted in a complaint, by the United States, alleging violation of the Federal Water Pollution Control Act, 33 U.S.C. § 1215 *et seq.* The parties had previously entered into two consent decrees, one dated July 29, 1974 and the other January 24, 1978, with that objective. *United States v. District of Columbia*, 654 F.2d at 804.

County. One of those suits challenged the validity of the state sewage sludge permit and alleged that Site 2 was a prospective nuisance. In the other, which alleged that restrictive covenants benefitting the land made acquisition of the Site 2 property so expensive that the WSSC Commissioners would likely be subject to liability for breach of fiduciary duty if they acquired it, the Circuit Court for Prince George's County issued an injunction enjoining WSSC from proceeding with development and ordering it to withdraw purchase offers made to the Site 2 owners. *United States v. District of Columbia,* 654 F.2d 802, 806 (D.C.Cir.), *cert. denied sub nom. Prince George's County v. United States,* 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981). The district court, reiterating the directives set forth in its prior orders, enjoined WSSC from complying with the state court injunction. It also ordered WSSC to proceed expeditiously to obtain the land and build and operate the composting facility. Finally, the court ordered Prince George's County to withdraw from the state court suits, and all parties to refrain from taking any action which would frustrate or impede the execution of its order.

Pursuant to the district court's July 10, 1980 order, WSSC filed, in the Circuit Court for Montgomery County, a condemnation action to acquire Site 2. The 115 acres to which it acquired title were burdened by certain restrictive covenants.[5] Consequently, WSSC filed an action against neighboring landowners, including the respondents, CAE–Link Corporation, AT & T Resource Management Corporation, International Fabricare Institute, Erie Indemnity Company and The Washington Post Company, seeking a declaration that the covenants' beneficiaries need not be compensated

---

**5.** The covenants specifically provided that:
> No waste material or refuse may be dumped or permitted to remain upon any part of the property outside of buildings, and that
> No emission of objectionable odors outside the lot line shall be permitted.

They specifically prohibited the use of the land for a "[d]ump or sanitary fill."

for their value. The defendants filed counterclaims for inverse condemnation, breach of covenant, nuisance, bad faith, pursuant to Maryland Rule 1–341, and violation of 42 U.S.C. § 1983, seeking monetary damages. Concluding that the restrictive covenants, which had been extinguished when WSSC condemned the land, were compensable property interests, the trial court denied WSSC declaratory relief.[6]

The trial court granted WSSC's motion for summary judgment as to the counterclaims alleging violation of § 1983, bad faith, and punitive damages, but denied it as to the inverse condemnation and breach of covenant claims. WSSC was granted partial summary judgment on the nuisance claim to the extent of requiring the respondents to prove that WSSC negligently created the nuisance. At trial, the breach of covenant claims having been dismissed by stipulation of the parties,[7] WSSC moved for judgment on the inverse condemnation and nuisance claims. Denying the motion as to the former, the trial court ruled, as to the latter:

---

**6.** That ruling was certified a final order, *see* Maryland Rule 2–602(a), and WSSC appealed. The Court of Special Appeals affirmed. *See WSSC v. Frankel,* 57 Md.App. 419, 470 A.2d 813 (1984). We granted certiorari and vacated the judgment, noting:

The difficulty is that most of the Claimants have also requested in their counterclaims monetary judgments for just compensation, if the circuit court entered an affirmative declaration on the compensability issue. But WSSC's claim for declaratory judgment and the requests of certain Claimants for monetary judgments are one and the same claim for purposes of applying former Md.Rule 605a. Thus, the entire claim has not been adjudicated in the circuit court by the ruling of December 8, 1982.

*WSSC v. Frankel,* 302 Md. 301, 308, 487 A.2d 651, 655 (1985). Nevertheless, the trial court's ruling undoubtedly is correct. *See Electro–Nucleonics,* 315 Md. at 367, 554 A.2d at 807. In *Mercantile–Safe Deposit & Trust Co. v. Mayor and City Council of Baltimore,* 308 Md. 627, 641, 521 A.2d 734, 740–41 (1987), we held that a restrictive covenant running with the land is a compensable property right, for condemnation purposes, to the extent it adds measurable value to that land to which it is attached.

**7.** The parties agreed that the covenants had been extinguished in July of 1980, when WSSC condemned Site 2.

With respect to the nuisance claim, the motion to dismiss is granted for two reasons. The first reason being that right or wrong I have held that in this case, based upon the facts in this case, that in order to recover on the nuisance theory, the Plaintiffs have to show simple negligence in the construction and operation of the facility. There is no evidence that I can recall to support that theory.

The second basis upon which I grant the motion on the nuisance, is that the law is set forth not only in [*Maryland Port Administration v.] QC [Corp.*, 310 Md. 379, 529 A.2d 829 (1987) ], but language in *Electro–Nucleonics [, Inc. v. WSSC*, 315 Md. 361, 554 A.2d 804, *cert. denied*, 493 U.S. 854, 110 S.Ct. 158, 107 L.Ed.2d 115 (1989) ] in that the court can find no substantial diminution in the use of any of these properties by any of the Plaintiffs as the result of the odor.

The inverse condemnation claim was submitted to the jury, which returned a verdict in favor of WSSC. The jury found that "the covenants extinguished on July 8, 1980 [did not] add measurable value to the respondent's land." Their motion for new trial having been denied, the respondents appealed. WSSC cross-appealed.

The Court of Special Appeals held that, because of its savings clause, the Federal Water Pollution Control Act does not preempt neighboring property owners' state law nuisance claims against WSSC for maintaining a facility that emits noxious odors. *CAE–Link Corp. v. WSSC*, 90 Md.App. 604, 615, 602 A.2d 239, 244, *cert. granted*, 327 Md. 304, 609 A.2d 312 (1992). It also held that nuisance law in Maryland is a matter of strict liability; hence, negligence is not a prerequisite to recovery. *Id.* at 616, 602 A.2d at 244. Additionally, the intermediate appellate court determined that the trial court erroneously instructed the jury that, in determining the value of the respondents' property, for inverse condemnation purposes, it was appropriate to consider whether extinguishment of the covenants substantially interfered with its use and enjoyment. *Id.* at 619, 602

A.2d at 245. Moreover, the court concluded, property appraisals prepared at the request of two of the respondents should not have been admitted under the business records exception. *Id.* at 623, 602 A.2d at 248. On WSSC's cross-appeal, the court reversed the trial court's rulings on "standing." It held that the respondents AT & T, BancTec Systems, Incorporated, and CAE–Link Corporation, which purchased their property after the land had been condemned, were "late-takers" and lacked standing to maintain an inverse condemnation action. *Id.* at 625–26, 602 A.2d at 249.

Both WSSC and the respondents filed petitions for certiorari. We granted WSSC's petition, but denied the respondents'.

## I.

### A.

█ The law of nuisance frequently has been discussed in the opinions of this Court. *See Eanes v. State,* 318 Md. 436, 455 n. 8, 569 A.2d 604, 613 n. 8 (1990); *Tadjer v. Montgomery County,* 300 Md. 539, 552, 479 A.2d 1321, 1327–28 (1984); *Corbi v. Hendrickson,* 268 Md. 459, 464, 302 A.2d 194, 197 (1973); *Slaird v. Klewers,* 260 Md. 2, 9, 271 A.2d 345, 348 (1970); *Stottlemyer v. Crampton,* 235 Md. 138, 143–44, 200 A.2d 644, 646 (1964); *Bishop Processing Co. v. Davis,* 213 Md. 465, 474, 132 A.2d 445, 449 (1957); *Gorman v. Sabo,* 210 Md. 155, 159, 122 A.2d 475, 478 (1956); *Fox v. Ewers,* 195 Md. 650, 658, 75 A.2d 357, 360 (1950); *Meadowbrook Swimming Club, Inc. v. Albert,* 173 Md. 641, 645, 197 A. 146, 148 (1938); *Jackson v. Shawinigan Electro Products Co.,* 132 Md. 128, 136, 103 A. 453, 455–56 (1918); *Northern Cent. Ry. Co. v. Oldenburg & Kelley, Inc.,* 122 Md. 236, 244, 89 A. 601, 605 (1914); *Gallagher v. Flury,* 99 Md. 181, 187, 57 A. 672, 675 (1904); *Euler v. Sullivan,* 75 Md. 616, 618, 23 A. 845, 846 (1892); *Susquehanna Fertilizer Co. v. Malone,* 73 Md. 268, 276, 20 A. 900, 901 (1890); *Woodyear v. Schaefer,* 57 Md. 1, 11–12

(1881); *Mayor and City Council of Baltimore v. Radecke,* 49 Md. 217, 227 (1878); *Adams v. Michael,* 38 Md. 123, 126 (1873); *Scott v. Bay,* 3 Md. 431, 444 (1853). We have held that, "where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies...." *Meadowbrook Swimming Club,* 173 Md. at 645, 197 A. at 148. Moreover, "[I]t makes no difference that the business [is] lawful and one useful to the public and conducted in the most approved method." *Bishop Processing Co.,* 213 Md. at 474, 132 A.2d at 449; *Meadowbrook Swimming Club,* 173 Md. at 645, 197 A. at 148. Virtually any disturbance of the enjoyment of the property may amount to a nuisance so long as the interference is substantial and unreasonable and such as would be offensive or inconvenient to the normal person. *Gorman,* 210 Md. at 159, 122 A.2d at 477, quoting *Prosser on the Law of Torts* 406–07 (2nd ed.).

In *Bishop Processing Co.,* the defendant, owner and operator of a processing plant, was enjoined from maintaining and operating its plant because the odors emanating from it interfered with the plaintiffs' lawful use and enjoyment of their properties. 213 Md. at 468–69, 132 A.2d at 446. Unreasonable noise from the continuous playing of a radio was the subject of the suit brought by the plaintiffs in *Gorman.* Although there was no claim for damages to the property, nor for diminution of its value, the Court held that the loud and offensive sounds interfered seriously with the plaintiffs' ordinary comfort and enjoyment of their property and, thus, constituted a private nuisance, for which actual and punitive damages would lie. 210 Md. at 162–64, 122 A.2d at 478–79. We opined: although the property may not be depreciated in its salable or market value, "it is the discomfort and annoyance in its use for purposes which is the primary consideration in allowing damages." *Id.* at 163, 122 A.2d at 479, quoting *Baltimore & Potomac Railroad Co. v. Fifth Baptist Church,* 108 U.S. 317, 335, 2 S.Ct. 719, 731, 27 L.Ed. 739, 746 (1883). In *Meadowbrook Swimming*

*Club,* the defendant operated a place of amusement which played amplifier enhanced dance music six nights per week. An injunction against that activity was upheld because the noise alone caused a number of residents and property owners actual physical discomfort and annoyance, thus constituting a nuisance. 173 Md. at 643–44, 197 A. at 147.

 Maryland has long adhered to the rule that proof of nuisance focuses not on the possible negligence of the defendant but on whether there has been unreasonable interference with the plaintiff's use and enjoyment of his or her property. *See Susquehanna Fertilizer Co.,* 73 Md. at 276, 20 A. at 901. To prove the existence of a nuisance, therefore, the complained of interference must cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits, *Fifth Baptist Church,* 108 U.S. at 335, 2 S.Ct. at 731, 27 L.Ed. at 745–46; it must interfere seriously with the ordinary comfort and enjoyment of the property. *Bishop Processing Co.,* 213 Md. at 474, 132 A.2d at 449; *Gorman,* 210 Md. at 159, 122 A.2d at 478; *Meadowbrook Swimming Club,* 173 Md. at 645, 197 A. at 148.

## B.

WSSC concedes that, in Maryland, nuisance is a matter of strict liability and that "liability for nuisance may arise even where there is compliance with applicable laws and regulations or where the offending instrumentality is authorized or permitted (as opposed to mandated) by state statute." Petitioner's reply brief at 2. Nevertheless it contends that it should not be held strictly liable in this case solely because of its good faith, and nonnegligent, execution of emergency and mandatory orders of the district court directing it to build and operate a sewage sludge composting facility at Site 2. It asks this Court to sanction an exception, given the unique circumstances of this case.

 Under the circumstances of this case, WSSC argues, strict liability for nuisance is inapplicable because its actions

were not voluntarily undertaken; rather than receive a "mere naked grant of power," the district court ordered it to build and operate a specific type of sludge composting facility, at a specific location and by a specific date. It relies on *Toy v. Atlantic Gulf & Pacific Co.*, 176 Md. 197, 213, 4 A.2d 757, 765 (1939), for the proposition that "[t]he basic concept underlying the rule [of strict liability for maintaining a dangerous condition] is that a *person who elects* to keep or bring upon his land something that exposes the adjacent land or its owner or occupant to an added danger should be obliged to prevent its doing damage." (emphasis added). It also contends that it should not be placed in a position where good faith compliance with one court's order should cause it to be held strictly liable in another.

In *Toy*, the defendant, a company hired by the federal government to dredge the Chesapeake and Delaware Canal, deposited the dredged material on an embankment constructed for that purpose. That embankment was on the west side of Back Creek and across from the plaintiffs' land. The plaintiffs used that waterway to transport carp by boat to their land. 176 Md. at 201, 4 A.2d at 759–60. A substantial amount of the dredged material and a portion of the embankment collapsed into the creek and denied the plaintiffs access to their property by boat and interfered with their operation of a pond constructed on their property for raising carp. *Id.* at 207, 4 A.2d at 760.

Initially, we note, as did the *Toy* Court, that the action before it was for negligence, not, as in the case *sub judice*, nuisance. *Id.* at 208, 4 A.2d at 763, There is, of course, a distinction between nuisance and negligence. *See Sherwood Bros., Inc. v. Eckard*, 204 Md. 485, 493, 105 A.2d 207, 211 (1954). In *Toy*, the Court did address the "doctrine of liability without fault," as enunciated in *Rylands v. Fletcher*, 1866, L.R. 1 Ex. 265, 279, *aff'd*, 1868, L.R. 3 H.L. 30. Pursuant to that doctrine,

> [T]he person who, for his own purposes, brings in his lands and collects and keeps there anything likely to do

mischief if it escapes must keep it at his peril;. and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. This doctrine addresses a different situation from that *sub judice, see also Yommer v. McKenzie,* 255 Md. 220, 257 A.2d 138 (1969), as the Court's discussion of private nuisance reveals:

> If the defendant had caused the earth and debris to be cast into the channel opposite the shore of the plaintiffs, and so filled it that the plaintiffs' limited navigable access to their shore and dam had been materially affected or destroyed, so that they had sustained damages which were so special and peculiar to their property as to make them substantially different from those suffered by the public generally, the plaintiffs would have a cause of action against the defendant on the theory of the unlawful creation of a private nuisance, since its existence *does not necessarily presuppose negligence* but may arise from an unlawful act.

176 Md. at 214, 4 A.2d at 766 (emphasis added).

The case *sub judice* is more closely akin to *Taylor v. Mayor and City Council of Baltimore,* 130 Md. 133, 99 A. 900 (1917). There, pursuant to state law, the City of Baltimore erected a sewage disposal plant 1500 feet from the plaintiff's property, on which a hotel and a dance and dining pavilion were located. The plaintiff brought an action for nuisance seeking damages for injuries to her property. *Id.* at 134, 99 A. at 901. After determining that the city had not "taken" the plaintiff's property, the Court framed the issue as "Whether the appellee, a municipal corporation, is liable under the facts and circumstances above ..., which would amount to a nuisance if done by a private corporation, or individuals—even if done by legislative authority." *Id.* at 143, 99 A. at 904. Answering in the affirmative, we said, "[t]he delegation of a power to do an act, whilst conferring full authority to perform the act itself, does not, therefore, without more, essentially and without exception, carry the right to so do it as to inflict

loss or injury upon an innocent individual." 130 Md. at 145, 99 A. at 904. Accordingly, the *Taylor* Court held that the City could be held liable for nuisance even though the construction of the sewage disposal plant did not result in a taking of plaintiff's property and was done pursuant to State authority. *Id.* at 142–43, 99 A. at 906. *See Bd. of Educ. v. Riverdale*, 320 Md. 384, 388, 578 A.2d 207, 209 (1990). See also *Richards v. Washington Terminal Co.*, 233 U.S. 546, 556–58, 34 S.Ct. 654, 658, 58 L.Ed. 1088, 1092–93 (1914), which addressed a similar issue.

There, the plaintiff owned a residence abutting railroad tracks and near a railroad tunnel. That residence, which had been let to a tenant, was damaged by the volumes of dense black or grey smoke, dust and dirt, cinders and gases emitted from the trains while passing over the tracks, going into or coming out of the tunnel, or standing on the tracks. Vibrations from the train also damaged the house. As a result, the property depreciated in value and the plaintiff, unable then to rent the house, was forced to occupy it himself. *Id.* at 549–50, 34 S.Ct. at 655, 58 L.Ed. at 1089–90. The Supreme Court held that the plaintiff had not been wholly excluded from the use and enjoyment of his property and, hence, no "taking" occurred in the ordinary sense. The Court noted, however, that "while the legislature may legalize what otherwise would be a public nuisance, it may not confer immunity from action for a private nuisance of such a character as to amount in effect to a taking of private property for public use." *Id.* at 553, 34 S.Ct. at 657, 58 L.Ed. at 1091. (citations omitted).

Addressing what is to be deemed a private nuisance that amounts to a taking, the Court referred to *Baltimore & Potomac Railroad Company v. Fifth Baptist Church*, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883). In that case, the railroad was immune from a private action by the church based upon inconveniences incidentally and unavoidably related to its operation of a railroad. Nevertheless, the Court pointed out that the church, in that case, had a cause of action "where a building for housing and repairing locomo-

tive engines was unnecessarily established in close proximity to ... [it] and [was] so used [as to] create[ ] a constant disturbance of the religious exercises." *Richards*, 233 U.S. at 555, 34 S.Ct. at 658, 58 L.Ed. at 1092. The Court therefore reasoned:

> "Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion."

*Id.* at 556, 34 S.Ct. at 658, 58 L.Ed. at 1092 quoting *Fifth Baptist Church,* 108 U.S. at 331, 2 S.Ct. at 728, 27 L.Ed. at 744. It further opined that congressional authority could not

> "be invoked to justify acts, creating physical discomfort and annoyance to others in the use and enjoyment of their property, to a less extent than entire deprivation, if different places from those occupied could be used by the corporation for its purposes, without causing such discomfort and annoyance."

*Id.*

In *Fifth Baptist Church,* the option of where to locate the repair shop and engine house rested with the railroad, while, in *Richards,* "the location of the tunnel and its south portal was established pursuant to law, and not voluntarily chosen by defendant." *Id.,* 233 U.S. at 557, 34 S.Ct. at 658, 58 L.Ed. at 1093. That distinction was insufficient to require a different result in *Richards* than in *Fifth Baptist Church,* however. As to

> such damage as is attributable to the gases and smoke emitted from locomotive engines while in the tunnel, and forced out of it by means of the fanning system through a portal located so near to plaintiff's property that these gases and smoke materially contribute to injure the furniture and to render the house less habitable than otherwise it would be,

*Richards,* 233 U.S. at 551, 34 S.Ct. at 656, 58 L.Ed. at 1090, the Court explained:

Construing the acts of Congress in the light of the Fifth Amendment, they do not authorize the imposition of so direct and peculiar and substantial a burden upon plaintiff's property without compensation to him. If the damage is not preventable by the employment at reasonable expense of devices such as have been suggested, then plaintiff's property is "necessary for the purposes contemplated," and may be acquired by purchase or condemnation ... and pending its acquisition defendant is responsible. If the damage is readily preventible, the statute furnishes no excuse, and defendant's responsibility follows on general principles.

233 U.S. at 557, 34 S.Ct. at 658, 58 L.Ed. at 1093 (citation omitted).

The district court ordered WSSC to build a sewage sludge composting facility in Montgomery County, Maryland. It did not select the site—Montgomery County, one of the two counties for which WSSC has responsibility for sewage, did that, *see United States v. District of Columbia*, 654 F.2d 802, 804 (D.C.Cir.), *cert. denied sub nom Prince George's County v. United States*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981)—nor mandate how, as opposed to when, the construction would proceed. WSSC acquired the land, and was solely responsible for the development of the facility.[8] While the district court expedited the construction, it was the petitioner that created the nuisance. A strict liability standard should apply. "[The United States District Court for the District of Columbia] can not be presumed, from general grant of authority, to have intend-

---

8. The respondents take issue with WSSC's characterization of its role in the development process. It contends that, far from being a helpless recipient of a federal court order, WSSC sought "a clear set of marching orders" so as to avoid problems which it perceived to exist, from the beginning. Indeed, the respondents suggest, and the record supports, that it was WSSC which requested the district court to order it to acquire Site 2 to expedite the process. The respondents argue, therefore, that WSSC is not entitled to any special consideration in light of the role it played in obtaining the federal district court orders it now characterizes as coercive.

ed to sanction or legalize any acts or any use of property that will create a private nuisance which will injuriously affect the property of another." *Taylor*, 130 Md. at 145, 99 A. at 905 (quoting *Mayor and City Council of Baltimore v. Fairfield Impro. Co.*, 87 Md. 352, 362, 39 A. 1081, 1083 (1898)). *See also Webb v. Town of Rye*, 108 N.H. 147, 230 A.2d 223 (1967) (statutory duty of town to provide and maintain public facilities for depositing garbage and refuse did not sanction the creating and maintenance of a nuisance); *Jones v. Knox County*, 205 Tenn. 561, 327 S.W.2d 473 (1959) (although acting in governmental capacity, county is not authorized to maintain a public nuisance in form of sewage treatment plant).

## II.

### A.

The supremacy clause to the United States Constitution, Article VI, clause 2, provides: "This constitution, and the laws of the United States . . . shall be the supreme law of the land. . . ." This clause has been interpreted to mean that "state laws which 'interfere with, or are contrary to the laws of Congress, made pursuant to the constitution' are invalid." *Wisconsin Public Intervenor v. Mortier,* ⸺ U.S. ⸺, ⸺, 111 S.Ct. 2476, 2481, 115 L.Ed.2d 532, 542 (1991) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211, 6 L.Ed. 23, 73 (1824)). The Supreme Court has identified three situations in which federal law preempts state law. *English v. General Electric*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65, 74 (1990). State law is preempted when Congress has explicitly defined the extent to which its enactment preempts state law. 496 U.S. at 78, 110 S.Ct. at 2275, 110 L.Ed.2d at 74. When there is no explicit statement of preemption, state law which seeks to regulate conduct in a field that Congress intended the federal government to occupy exclusively is preempted. *Id.* at 79, 110 S.Ct. at 2275, 65 L.Ed.2d at 74. State law is also preempted to the extent that it actually conflicts with federal law, *id.;*

*Maryland v. Louisiana*, 451 U.S. 725, 747, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576, 596 (1981), as "when compliance with both federal and state regulations is a physical impossibility". *Harrison v. Schwartz*, 319 Md. 360, 364, 572 A.2d 528, 530, *cert. denied*, 498 U.S. 851, 111 S.Ct. 143, 112 L.Ed.2d 110 (1990); *Becker v. Litty*, 318 Md. 76, 86, 566 A.2d 1101, 1106 (1989); *Bd. of Trustees v. Mayor & City Council of Baltimore City*, 317 Md. 72, 115, 562 A.2d 720, 741 (1989), *cert. denied sub nom., Lubman v. Mayor & City Council of Baltimore City*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990); *Hecht Co. v. C & P Telephone Co.*, 310 Md. 148, 152, 528 A.2d 474, 476 (1987), quoting *Hillsborough County, Fla. v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985).

WSSC posits that the district court orders requiring it to build and operate a composting facility on Site 2 conflicted with, and, therefore, preempted, Maryland's rule of strict liability in nuisance. Relying on the second and third bases for preemption, it makes two arguments: (1) that the emergency federal court orders issued pursuant to the Water Pollution Control Act, under the unique circumstances of this case, effect the preemption and (2) that Maryland law is preempted because it was impossible for WSSC to comply with both the federal court orders and Maryland law.

### 1.

Underlying WSSC's first argument is the premise that the savings clause, § 1365(e) [9] applies only to citizens' suits. WSSC argues that § 1365(e) has no applicability, broadly, to the Water Pollution Control Act and, in particular, to court

---

9. 33 U.S.C. § 1365(e) provides:

(e) *Statutory or common law rights not restricted.* Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

orders issued pursuant to § 1364.[10] Because the district court orders were issued pursuant to the emergency powers, to which the savings clause is inapplicable, WSSC asserts, the Maryland nuisance standard is not saved, but is preempted. It advises us that this result is mandated by *International Paper Company v. Ouellette*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

Even if we assume, *arguendo*,[11] that federal district court orders can trigger preemption, no such preemption occurred in this case. In *Ouellette*, Vermont property owners sued, in a Vermont state court, the operator of a New York pulp and paper mill for nuisance. The property

---

**10.** Section 1364 provides:

(a) *Emergency Powers.* Notwithstanding any other provision of this Act, the Administrator upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to the livelihood of such persons, such as inability to market shellfish, may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary.

The respondents assert that the record is not at all clear that the suit, pursuant to which the district court orders at issue were passed, was brought under § 1364. They correctly point out that there is nothing in the record to indicate that the administrator brought the action. On the other hand, the July 10, 1978 order states that it was issued "on the basis of the existence of an emergency affecting the health and safety of the residents of the Washington metropolitan area." Moreover, it is clear that the United States filed the complaint alleging the failure of, *inter alia*, WSSC and Montgomery County to devise a permanent sludge management plan, which failure resulted in increased discharges into the Potomac River in violation of the Federal Water Pollution Control Act. *United States v. District of Columbia*, 654 F.2d at 804.

**11.** We observe, as the respondents argue, that the preemption doctrine operates in the context of the United States Constitution and the *laws* of the United States. Thus, when the Constitution of the United States is not involved, it is the laws enacted by Congress in an attempt to carry out congressional intent, to which the doctrine relates. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 674–75 (1982).

owners alleged that pollutants discharged by the New York mill made the water in Vermont "foul, unhealthy, smelly, and unfit for recreational use," and, thus, constituted a "continuing nuisance." The action having been removed to federal district court, the mill operator moved for summary judgment, arguing that the Clean Water Act (the Water Pollution Control Act), preempted the state law suit. *Id.* at 484, 107 S.Ct. at 807, 93 L.Ed.2d at 892. The district court denied the motion, finding that the Act's savings clause preserved actions to redress interstate water pollution under the law of the state in which the injury occurred. 602 F.Supp. 264 (D.Vt.1985). The Court of Appeals for the Second Circuit affirmed. 776 F.2d 55 (2d Cir.1985).

After analyzing the Act's regulatory framework and legislative history, the Supreme Court rejected the argument that the savings clause preserved a state's right to regulate its waters and an injured party's right to seek relief under any statute or the common law of the state in which the injury occurred. 479 U.S. at 492, 107 S.Ct. at 811–12, 93 L.Ed.2d at 896–97. It held that the Act precludes a court from applying the law of an affected State against an out-of-state source. *Id.* at 493–94, 107 S.Ct. at 812, 93 L.Ed.2d at 898. *See also Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Bd.*, 467 U.S. 461, 477, 104 S.Ct. 2518, 2527, 81 L.Ed.2d 399, 411 (1984). If it were otherwise—if affected states were allowed to impose separate discharge standards on a single point source—the Court explained, serious interference with the achievement of the "full purposes and objectives of Congress" would result:

> If a New York source were liable for violations of Vermont law, that law could effectively override both the permit requirements and the policy choices made by the source State. The affected State's nuisance laws would subject the point source to the threat of legal and equitable penalties if the permit standards were less stringent than those imposed by the affected State. Such penalties would compel the source to adopt different control stan-

dards and a different compliance schedule from those approved by the EPA, even though the affected State had not engaged in the same weighing of the costs and benefits.

479 U.S. at 495, 107 S.Ct. at 813, 93 L.Ed.2d at 899.

The property owners were not without a remedy, the Court pointed out, because, even though Congress intended to dominate the field of pollution regulation, the savings clause negates the inference that Congress "left no room" for state causes of action. *Id.* at 492, 107 S.Ct. at 812, 93 L.Ed.2d at 897. Indeed, it noted, "[t]he savings clause specifically preserves other state actions, and ... nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State." *Id.* at 497, 107 S.Ct. at 814, 93 L.Ed.2d at 900. The Court explained:

An action brought against IPC under New York nuisance law would not frustrate the goals of the CWA as would a suit governed by Vermont law. First, application of the source State's law does not disturb the balance among federal, source-state, and affected-state interests. Because the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership established by the permit system. Second, the restriction of suits to those brought under source-state nuisance law prevents a source from being subject to an indeterminate number of potential regulations. Although New York nuisance law may impose separate standards and thus create some tension with the permit system, a source only is required to look to a single additional authority, whose rules should be relatively predictable. Moreover, States can be expected to take into account their own nuisance laws in setting permit requirements.

*Id.* at 498–99, 107 S.Ct. at 815, 93 L.Ed.2d at 900–01 (footnotes omitted).

In the course of discussing the effect of the savings clause on suits brought under the laws of the affected state, the Supreme Court observed:

Section 505(e) [the savings clause] merely says that "[n]othing *in this section,*" *i.e.,* the citizen-suit provisions, shall affect an injured party's right to seek relief under state law; it does not purport to preclude preemption of state law by other provisions of the Act. *Id.* at 493, 107 S.Ct. at 812, 93 L.Ed.2d at 897. Focusing on these comments, surmising that the district court orders in this case were issued under § 1364, and stressing that the first sentence of § 1365(e) refers only to that section, WSSC argues that "the 'savings clause' is inapplicable to actions under § 1364." It concludes that the federal orders in this case preempted the strict liability standard for nuisance because it "conflicts with, 'stands as an obstacle to' or 'interferes with the methods' for reaching federal environmental goals." Petitioner's brief at 22, quoting *Ouellette,* 479 U.S. at 494, 107 S.Ct. at 813, 93 L.Ed.2d at 898.

As we have seen, the Supreme Court held that the savings clause did preserve other state law remedies when those remedies were sought pursuant to the law of the source state. *Ouellette* simply does not stand for the proposition that all actions under the Clean Water Act, except the citizens' suit section, preempt state law. WSSC reads the savings clause much too narrowly. To the extent that the action does not otherwise thwart the goal of the Clean Water Act, the savings clause does preserve state law remedies. Notwithstanding its inclusion within § 1365, the effect of the savings clause is not limited to that section; it is, rather, a recognition that, in addition to actions under the Clean Water Act, persons injured by pollution may seek additional remedies. The mere inclusion in the same section, of a statute both a specific remedy and a savings clause does not limit the injured person to the specified remedy only.

2.

The next argument that WSSC makes is that the strict liability feature of Maryland's nuisance law made it impossible, for WSSC to carry out the federal court orders and

comply with State law at the same time. Compliance with both, it maintains, is a physical impossibility. It offers as the best evidence that this is so, the district court's June 27, 1980 order and the opinion of the United States Court of Appeals affirming those orders. *See generally United States v. District of Columbia*, 654 F.2d 802 (D.C.Cir.), *cert. denied sub nom., Prince George's County v. United States*, 454 U.S. 1082, 102 S.Ct. 637, 70 L.Ed.2d 616 (1981). WSSC points out that the June 27, 1980 order required various parties to withdraw their complaints; one of which sought a declaration that it was a prospective nuisance, against the Site 2 project in Maryland State courts.

■■■ The federal court orders, of course, did not expressly prohibit the filing and maintenance of nuisance actions with respect to operation of Site 2, against WSSC in a Maryland court. It is true, however, that, for there to be preemption, the conflict between State and federal laws which makes compliance with both "a physical impossibility," need not be direct; it may be indirect. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 155–56, 102 S.Ct. 3014, 3023–24, 73 L.Ed.2d 664, 676–77 (1982). Nevertheless, the Court of Special Appeals correctly determined that there was no conflict. It quite properly observed, in that regard, that "the federal district court ordered WSSC to build and operate a composting site in the MIP. It did not, however, order Appellee to build and operate a composting site that emits obnoxious odors that invade the property of others." *CAE–Link*, 90 Md.App. at 615, 602 A.2d at 244.

When the federal district court orders were passed, the issue before the court was the development of the composting plant, *i.e.*, its compliance with the Clean Water Act and the comprehensive program submitted by the parties. The issue was not how the composting plant was to be constructed or whether, as constructed, it would have a nuisance impact on the surrounding community. Different considerations underlie these very different issues. An order that seeks to contain challenges and to have them

litigated in a single forum does not, contrary to WSSC's argument, have ramifications for federal preemption of a state nuisance action. The district court relied on the public interest in seeing that all challenges and objections to the sludge disposal plant be expeditiously and consistently resolved as the basis for requiring that all adjudications of that issue occur in that court.

■ Moreover, in order to build the composting facility, the petitioner had to condemn 115 acres of land and extinguish the restrictive covenants benefitting that land. That was a cost of the facility. The elimination of odors, or compensating those affected, is likewise a cost of the facility if the plant emits the odors. The Court of Special Appeals put it thusly,

> If the users within the entire area serviced by [the petitioner] through the operation of Site II, are going to inflict the odors generated by the treatment of their sludge on a limited number of Site II neighbors, we see no reason why they should not be required to alleviate that damage or compensate those they damage.

90 Md.App. at 617, 602 A.2d at 245. *See also Fifth Baptist Church,* 108 U.S. at 332, 2 S.Ct. at 729, 27 L.Ed. at 744.

### B.

WSSC argues that, even if the strict liability standard in nuisance is not preempted by the emergency orders of the district court, principles of comity and sound judicial policy require that it not be applied in this case. Noting that by enacting the Federal Water Pollution Control Act and vesting primary responsibility and control over its implementation in a federal agency, *see Cleveland Electric Illuminating Co. v. Envtl. Protection Agency,* 603 F.2d 1, 5 (6th Cir.1979), Congress expressed a paramount interest in the restoration of the navigable waters of the nation, and that the district court gave it no choice but to develop the Site 2 project, it urges us, by application of comity, to refrain from applying the strict liability in assessing whether it should be held liable for nuisance. It asks that, instead, we adopt a

different standard, applicable only to this case. We decline to do so.

■ Under the doctrine of comity, courts of one state or jurisdiction will give effect to laws and judicial decisions of another state or jurisdiction, not as a matter of obligation but out of deference and respect. *Galloway v. Watts,* 395 F.Supp. 729, 731 (D.Md.1975). That doctrine is a part of our common law. *Holloway v. Safe Deposit & Trust Co.,* 151 Md. 321, 334, 134 A. 497, 501 (1926).

■ We are not being asked to defer to the federal law of nuisance. We are simply being asked to refrain from applying this State's law, not because it is inapplicable, but because, in WSSC's opinion, when applied in the context of the federal orders in this case, it may have a harsh result. None of the cases WSSC cites, *see Fair Assessment in Real Estate Ass'n, Inc. v. McNary,* 454 U.S. 100, 102–03, 108–12, 102 S.Ct. 177, 179, 181–84, 70 L.Ed.2d 271, 275, 278–281 (1981); *Mitcheson v. Harris,* 955 F.2d 235, 239–40 (4th Cir.1992); *Cox Cable Hampton Roads v. City of Norfolk,* 739 F.Supp. 1074, 1076–77 (E.D.Va.1990) (refusal of federal courts to exercise jurisdiction over matters of state law more appropriately handled by the state courts) requires, nor are we persuaded by WSSC's arguments, that we should do so.

## C.

■ Relying on the Restatement (2nd) of Torts § 822,[12] WSSC argues that liability for private nuisance should apply only when the interferences with the private use and enjoyment of property are intentional and unreasonable or

---

**12.** The Restatement (Second) of Torts § 822 provides:
 One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
 (a) intentional and unreasonable, or
 (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

caused by negligence, or reckless, or abnormally dangerous conduct. It urges, therefore, that we reject the strict liability standard and join the jurisdictions which have adopted the Restatement's formulation.[13] Aside from the fact that other courts have adopted the Restatement, WSSC provides no reasoned basis for our discarding the strict liability standard which has a pedigree of long standing in this state. *See e.g. Adams v. Michael,* 38 Md. 123, 126 (1873); *Scott v. Bay,* 3 Md. 437, 444 (1853). For that reason alone, we refuse WSSC's invitation.[14] Moreover, it is not the unanimous verdict of other jurisdictions that the Re-

---

**13.** *Nissan Motor Corp. v. Maryland Shipbuilding & Drydock Co.,* 544 F.Supp. 1104 (D.Md.1982), *aff'd,* 742 F.2d 1449 (4th Cir.1984); *District of Columbia v. Fowler,* 497 A.2d 456 (D.C.Cir.1985); *Rumbough v. Tampa,* 403 So.2d 1139 (Fla.App.1981); *Richmond Bros. Inc. v. Hagemann,* 359 Mass. 265, 268 N.E.2d 680 (1971); *Maerz v. United States Steel Corp.,* 116 Mich.App. 710, 323 N.W.2d 524 (1982); *Rebel v. Big Tarkio Drainage Dist.,* 602 S.W.2d 787 (Mo.App.1980); *Hall v. Phillips,* 231 Neb. 269, 436 N.W.2d 139 (1989); *Burke v. Briggs,* 239 N.J.Super. 269, 571 A.2d 296 (1990); *Copart Ind. v. Consolidated Edison Co,* 41 N.Y.2d 564, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977); *Waschak v. Moffat,* 379 Pa. 441, 109 A.2d 310 (1954).

**14.** While acknowledging that this Court has not explicitly rejected strict liability as a standard for the proof of nuisance, WSSC suggests that we may have done so implicitly. It refers to *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 132–33, 497 A.2d 1143, 1146–47 (1985); *Yommer v. McKenzie,* 255 Md. 220, 225–226, 257 A.2d 138, 139 (1969), cases adopting the Restatement (Second) of Torts, §§ 519 and 520, relating to "Abnormally dangerous activities." Nothing in these opinions make that suggestion. Abnormally dangerous activities or conditions are not the only types of nuisances recognized in this state. Nuisance is usually placed into three classifications:

> First, those which are nuisance per se or by statute; second, those which prejudice public health or comfort such as slaughterhouses, livery stables, etc.; third, those which in their nature are not nuisances, but may become so by reason of their locality, surroundings, or the manner in which they may be maintained.

*Burley v. Mayor, Counsellor and Alderman of City of Annapolis,* 182 Md. 307, 312, 34 A.2d 603, 605 (1943) (quoting 2 *Dillon on Municipal Corporations,* 1044–45 (5th ed.). Sewage composting facilities, like slaughterhouses or livery stables, prejudice public comfort. We have stated "[i]t is not necessary that a public nuisance should be injurious to health; if there be smells offensive to the senses, that is enough...." *Woodyear v. Schaefer,* 57 Md. 1, 12 (1881) (quoting *Rex v. Neil,* 2 C. & P 185).

statement should be adopted and the strict liability standard for nuisance discarded. *See Graber v. Peoria,* 156 Ariz. 553, 753 P.2d 1209, 1211 (Ariz.Ct.App.1988) (whether an interference is unreasonable is determined by the injury caused by the condition and not by the conduct of the party creating the condition); *Turner v. Thompson,* 102 Ill. App.3d 838, 58 Ill.Dec. 215, 219, 430 N.E.2d 157, 161 (1981) (Negligence is not involved in an action with respect to nuisance); *Page County Appliance Center, Inc. v. Honeywell, Inc.,* 347 N.W.2d 171, 175 (Iowa 1984) (The existence of a nuisance is not affected by the intent of its creator not to injure anyone); *State v. Lloyd A. Fry Roofing Stevenson,* 310 Minn. 535, 246 N.W.2d 692, 695 (1976) (Negligence and nuisance are distinct concepts and the defendant's negligence or failure to act reasonably is not an essential element in a nuisance action); *Frank v. Envtl. Sanitation Mgmt. Inc.,* 687 S.W.2d 876, 880 (Mo.1985) (Nuisance is a condition and does not depend on the degree of care used).

## III.

In addition to the failure to produce evidence of negligence in constructing and operating the composting facility, the trial judge ruled, alternatively:

> The second basis upon which I grant the motion on the nuisance, is that the law is set forth not only in *[Maryland Port Administration v.] QC [Corp.,* 310 Md. 379, 529 A.2d 829 (1987) ], but language in *Electro–Nucleonics [, Inc. v. WSSC,* 315 Md. 361, 554 A.2d 804, *cert. denied,* 493 U.S. 854, 110 S.Ct. 158, 107 L.Ed.2d 115 (1989) ] in that the court can find no substantial diminution in the use of any of these properties by any of the Plaintiffs as the result of the odor.

The Court of Special Appeals held that ruling was error. It reasoned that neither *QC,* nor *Electro–Nucleonics,* ad-

dressed the standard of proof applicable to nuisance;[15] rather, both dealt with the standard required to prove a non-possessory taking. 90 Md.App. at 619, 602 A.2d at 246. On this point, the intermediate appellate court is clearly correct.

In *QC*, the issue was "whether, by operating a hazardous waste disposal facility on its own land, the State of Maryland has taken adjacent leasehold property of the plaintiff." 310 Md. at 381, 529 A.2d at 829. In *Electro–Nucleonics*, in addition to that raised in *QC*, the issue was whether "property of the appellant in the form of the benefit of certain restrictive covenants which had burdened the condemned property" had been taken. 315 Md. at 363, 554 A.2d at 805.

While not disputing that *QC* and *Electro–Nucleonics* did not involve nuisance, WSSC maintains that the trial court applied the correct standard to assess the sufficiency of the evidence of nuisance to create a jury question. It asserts that neither respondent presented "sufficient evidence from which the jury could find that the value of each Respondent's property was diminished *materially* as a result of odors from Site II *and* that those odors *seriously* interfered with each Respondent's use of its property." Petitioner's brief at 36.

█ Not every interference with the use or enjoyment of land constitutes an actionable nuisance. *Adams v. Michael*, 38 Md. 123, 126 (1873). To be actionable, "[t]he injury must be of such a character as to diminish materially the value of the property as a dwelling [or for the purpose] and seriously interfere with the ordinary comfort and enjoyment of it." (citations omitted). *Slaird v. Klewers*, 260

---

15. A nuisance count was pled in *Maryland Port Admin. v. QC Corp.*, 310 Md. 379, 385, 529 A.2d 829, 831 (1987); however, it was dismissed for failure to give the State notice, a ruling not challenged on appeal. In part III of the opinion, the Court considered "the taking claim from a nuisance point of view." *Id.* at 391 n. 9, 529 A.2d at 834 n. 9. By that, we meant that we would consider whether in that case a taking had occurred, as it could have, "without a physical invasion of the property allegedly taken." *Id.* at 399–402, 529 A.2d at 838–840.

Md. 2, 9, 271 A.2d 345, 348 (1970). *See Stottlemyer v.
Crampton,* 235 Md. 138, 143–44, 200 A.2d 644, 646 (1964);
*Bishop Processing Company v. Davis,* 213 Md. 465, 472–
474, 132 A.2d 445, 449 (1957); *Gorman v. Sabo,* 210 Md.
155, 162–64, 122 A.2d 475, 478 (1956); *Five Oaks Corp. v.
Gathmann,* 190 Md. 348, 352, 353, 58 A.2d 656, 658 (1948);
*Meadowbrook Swimming Club,* 173 Md. 641, 645, 197 A.
146, 148 (1938). This standard is best understood by refer-
ence to its application in specific cases.

*Bishop's Processing Company* involved a suit perpetual-
ly to enjoin the operator of a processing plant from main-
taining and operating the plant so that the odors emanating
from the plant interfered with the rightful use and enjoy-
ment by the plaintiffs of their properties in the area. The
evidence showed that the plaintiffs resided between one-
half to one mile of the plant and that

> the process used by the Company in manufacturing its
> products, when not curbed, produces a shocking and
> nauseating stench and odor which permeates the sur-
> rounding atmosphere for more than a mile and that the
> stench is so bad that even though the doors and windows
> of the homes of persons living in the neighborhood sur-
> rounding the plant are closed, it comes into the homes
> causing throat irritations, severe headaches, loss of appe-
> tite, nausea, regurgitation and in other ways interferes
> with the comfortable enjoyment of their homes by the
> appellees in this proceeding. The appellees complained
> particularly of terrific, indescribable unwholesome efflu-
> via that came from the plant and which varied only with
> the change of the direction of the wind, and stated that
> while there was relief when the wind blew the odor away
> from a particular location it was continuous during the
> operation of the plant in that it followed the wind and
> caused discomfort in another location in the direction
> from the plant in which the wind was blowing.

213 Md. at 470, 132 A.2d at 447. The Court rejected the
argument that the evidence was insufficient to establish
that, had they sued at law, the plaintiffs would have been

entitled to substantial damages. Applying the test set out above, it held that the plaintiffs had shown sufficient discomfort and injury to their properties to entitle them to injunctive relief. The Court said:

> [T]he evidence justifies a finding that the odors complained of caused physical discomfort and annoyance to those of ordinary taste, sensibilities and habits; and that the injury to the appellees' properties was of such a character as to diminish materially their value as dwellings, and to interfere seriously with the ordinary comfort and enjoyment thereof. This clearly brings the appellees within the above quoted and cited decisions of this Court so as to be entitled to relief.

213 Md. at 474, 132 A.2d at 449. One of the cases to which the Court referred was *Meadowbrook Swimming Club*. In that case, we said that,

> where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies at law or equity. In such cases it makes no difference that the business was lawful and useful to the public and conducted in the most approved method.

173 Md. at 645, 197 A. at 148 (citations omitted).

The allegation in *Gorman* was that

> the Gormans "embarked upon an intentional malicious and willful course of action to annoy, harass and injure the plaintiffs by causing, permitting, or causing and permitting loud and offensive sounds to emanate from their said property in such a way as to pass over into the plaintiffs' property resulting in serious interference with the ordinary comfort, use and enjoyment by the plaintiffs of their property, and persisted and still persist in continuation of the said course of action after frequent requests to desist."

210 Md. at 158–59, 122 A.2d at 476. We held that:

> If noise causes physical discomfort and annoyance of persons of ordinary sensibilities, tastes and habits and

seriously interferes with the ordinary comfort and enjoyment of their homes, and thus diminishes the value of the use of their property rights, it constitutes a private nuisance, entitling those offended against to damages.

*Id.* at 159, 122 A.2d at 476 (citations omitted). We went on to quote Prosser, *Law & Torts* 406, 407 (2d ed.) for the proposition that noise that disturbs the comfort or convenience of the occupant of property is a nuisance and, "[s]o long as the interference is substantial and unreasonable, and such as would be offensive or inconvenient to the normal person, virtually any disturbance of the enjoyment of the property may amount to a nuisance." *Id.* Moreover, we said,

Where there is a non-trespassory invasion of rights in real property occupied by the owner as a home, consisting of a temporary private nuisance, the measure of damages is the diminution in the value of the use of the property as a home. The elements to be considered in the loss of the value of the use include the ordinary use and enjoyment of the home, and may also include sickness or ill health of those in the home caused by the nuisance.

210 Md. at 162, 122 A.2d at 478. Among the authorities cited for that proposition was *Baltimore & PR Co. v. Fifth Baptist Church*, 108 U.S. 317, 2 S.Ct. 719, 27 L.Ed. 739 (1883). In that case, as we have seen, the Supreme Court said:

The plaintiff was entitled to recover because of the inconvenience and discomfort caused to the congregation assembled, thus necessarily tending to destroy the use of the building for the purposes for which it was erected and dedicated. The property might not be depreciated in its salable or market value.... But, as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages.

*Id.* at 335, 2 S.Ct. at 731, 27 L.Ed. at 745–46. *See also Beahm v. Shortall,* 279 Md. 321, 341–42, 368 A.2d 1005, 1017 (1977); *Carr's Beach Amusement Co. v. Annapolis Roads,* 222 Md. 392, 396, 160 A.2d 598, 600 (1960); *Mass Transit Admin. v. Miller,* 271 Md. 256, 259, 315 A.2d 772, 774 (1974); *Meadowbrook Swimming Club,* 173 Md. at 644–47, 197 A. at 148.

██ The Court of Special Appeals referred to the evidence presented by the respondents to prove that WSSC's operation of Site 2 interfered with their use and enjoyment of their property. *See* 90 Md.App. at 618, 602 A.2d at 245. From that testimony, the jury could have found that the odors emanating from WSSC's plant produced "actual physical discomfort to persons of ordinary sensibilities, tastes, and habits," thereby diminishing materially the value of the property as a commercial establishment and seriously interfering with their ordinary comfort and enjoyment.

### IV.

The trial judge admitted into evidence, as proof of damages on the inverse condemnation count, three real estate appraisals prepared at the request of AT & T and two appraisals made at the request of Computer Entry Systems (now BancTec Systems, Inc.). These appraisals showed that, rather than decreasing in value, the AT & T and BancTec properties had actually increased in value since the composting facility was built. When the admissibility of these reports was raised, AT & T, BancTec and CAE–Link [16] expressly objected. Holding that they were business records, the trial court overruled the objections and admitted the reports pursuant to Maryland Code (1989) § 10–101 of the Courts and Judicial Proceedings Article. The respondents argued, both in the trial court and before the Court of Special Appeals, that the records were inadmissible for lack of authentication and because they are hearsay. The Court

---

16. WSSC does not definitively concede that CAE–Link objected; it does, however, acknowledge that it is arguable that it did.

of Special Appeals held that the trial court committed clear error, and reversed.

WSSC's challenge to this portion of the Court of Special Appeals' opinion is three-fold. First, noting that the court held that BancTec, AT & T, and CAE–Link lacked standing to maintain an inverse condemnation action against it, which was rendered final when we denied their petition for certiorari and, therefore, can no longer enjoy the benefits of a reversal on that issue, it asserts that the other respondents waived the issue when they failed to object to the admissibility of the reports.

Second WSSC argues that, assuming the erroneous admission of the appraisals, only AT & T and BancTec were prejudiced; it was harmless and non prejudicial as to the other respondents. Finally, WSSC contends that the reports were properly admitted into evidence.

As to the preservation argument, the respondents correctly point out that during pretrial discussions, when an attorney for one of the parties [17] attempted to insure that objections previously made were preserved as to his or her client, the court indicated that "they [objections] apply to all plaintiffs, is that right? That is understood." An attorney then said, "An objection for one is an objection for all plaintiffs." No one stated a contrary position and the record does not reflect that, at any time thereafter, the ground rules were changed. Accordingly, despite no explicit objection having been made by any of the respondents whose inverse condemnation claim survives, the issue was not thereby waived. *See Mejia v. State,* 328 Md. 522, 539, 616 A.2d 356, 364 (1992).

Nor was the error harmless. No limiting instruction was given. While the reports purported to relate only to AT & T's and BancTec's property, the appraisals themselves con-

---

**17.** The attorney did not identify himself nor his client, as required. In fact, the transcript reflects that the rule the court imposed, that counsel should identify themselves when speaking, was more honored in the breach.

tained comments and opinions about the neighborhood in which the AT & T and BancTec property was located. One of the AT & T appraisals titled "Neighborhood Analysis" stated,

[T]he subject neighborhood will likely experience an increased rate of growth regarding high tech development and should continue to enjoy expansion in the residential sector. New office development is becoming more preponderant in this neighborhood and tends to increase the overall quality of the type of properties. This new development should tend to enhance land values in the area and promote future marketability of properties in this neighborhood.

Similarly, the section of BancTec's appraisal titled "Neighborhood Data" described the area thusly, "Real estate values in the subject neighborhood have continued to increase over the past several years because of the excellent location with respect to the Washington Metropolitan Area." The jury could have inferred from that that the property of the other respondents also increased in value.

■■■ In holding the appraisals inadmissible, the Court of Special Appeals noted, that the appraisals, rather than being required by law, on the day-to-day functions of the business, the appraisals were requested by AT & T and BancTec, and that the appraisals had no effect on the operation of those businesses. 90 Md.App. at 623–24, 602 A.2d at 248. The court concluded, therefore, that the appraisals do not qualify as business records. *Id.* We agree.

## V.

■■■ On the issue of damages for inverse condemnation; the trial judge instructed the jury on the issues of damages, as follows:

[t]he measure of damages, if any, to Plaintiffs for the loss of their right to enforce the restrictive covenants against the Washington Suburban Sanita[ry] Commission,

shall be determined by comparing the fair market value of each of the Plaintiffs' property immediately prior to the July 8, 1980 extinguishment of the restrictive covenants, with the fair market value of each Plaintiffs' properties immediately after July 8, 1980.

Any difference that you may find between those values should be the measure of damages available to each Plaintiff in this proceeding.

\* \* \* \* \* \*

In the determination of any changes of value of the Plaintiff's [sic], you may consider whether there was substantial interference with the use and enjoyment of the property by Plaintiff's [sic] resulting from extinguishment of the covenants.

WSSC maintains that the trial judge correctly instructed the jury concerning the valuation of the respondents' property. Relying on Maryland Code (1988) § 12–104(b) of the Real Property Article, it asserts that consequential damages may be awarded for a partial taking, which may be proven by evidence of specific problems the taking and future public use caused.

The respondents argue, on the other hand, that the instruction erroneously suggested that they had to prove, in addition to measurable value, that the extinguishment of the covenants would "substantially interfere" with the use and enjoyment of their properties. That is not, they posit, the proper test for determining the extent to which restrictive covenants add measurable value to a property.

Section 12–104(b) provides:

The damages to be awarded where land, or any part of it, is taken is the fair market value of the part taken, but not less than the actual value of the part taken plus any severance or resulting damages to the remaining land by reason of the taking and of future use by the plaintiff of the part taken. The severance or resulting damages shall be diminished to the extent of the value of the special

(particular) benefits to the remainder arising from the plaintiff's future use of the part taken.

In *Brannon v. State Road Comm'n*, 305 Md. 793, 506 A.2d 634 (1986), we noted that damages for a partial taking may be assessed in two ways: the measure of damages prescribed by § 12–104(b), *i.e.*, "the actual value of the part taken plus any severance or resulting damages to the remaining land by reason of the taking and of future use by the plaintiff of the part taken." 305 Md. at 799, 506 A.2d at 637, (footnote omitted) and "the difference between the fair market value of the entire tract before the taking and the fair market value of what is left thereafter." *Id.* (quoting *Big Pool v. State Roads Comm'n*, 245 Md. 108, 113, 225 A.2d 283, 285 (1967) (citing *Mayor and City Council of Baltimore v. State Roads Comm'n*, 232 Md. 145, 152, 192 A.2d 271, 279 (1963)). *See also Oxon Hill Rec. Club, Inc. v. Prince George's County*, 281 Md. 105, 107–08, 375 A.2d 564, 566 (1977); *Bd. of Educ. v. Hughes*, 271 Md. 335, 345, 317 A.2d 485, 490 (1974); *State Roads Comm'n v. Hance*, 242 Md. 137, 139, 218 A.2d 33, 35 (1966). We pointed out that these different methods have the same goal: putting the landowner in as good a pecuniary position as if no taking had occurred. 305 Md. at 799, 506 A.2d at 637–38, citing *Dodson v. Anne Arundel County*, 294 Md. 490, 494, 451 A.2d 317, 320 (1982). They are not, however, cumulative. "The landowner may choose to offer direct evidence, in the form of expert testimony.... [o]r, the landowner may choose to offer no direct evidence of consequential damages and, instead, offer evidence pertaining to the before-taking and after-taking value of the property." *Id.* [305 Md.] at 801, 506 A.2d at 639. The first two paragraphs contained a proper instruction on the before/after valuation method, consistent with the respondents' theory. The court should have stopped there. By going further and addressing whether there was substantial interference with the use and enjoyment of the property, it attempted to employ the statutory method of assessing damages as well. Because

only one method may be utilized, and, in this case, was sought to be used, the court erred.

JUDGMENT AFFIRMED, WITH COSTS.