26 A.3d 931

**Douglas WIETZKE, et ux.**

v.

**The CHESAPEAKE CONFERENCE ASSOCIATION, et al.**

**No. 122, Sept. Term, 2010.**

Court of Appeals of Maryland.

Aug. 17, 2011.

Neil Intrater (Intrater Law Office, Silver Spring, MD), on brief, for petitioners.

Lauri E. Cleary (J. Bradford McCullough and Emily B. Rachlin of Lerch, Early & Brewer, Chartered, Bethesda, MD), on brief, for respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, and BARBERA, JJ.

BATTAGLIA, J.

Douglas and Vanessa Wietzke, Petitioners, filed a four-count complaint against the Chesapeake Conference Association of Seventh–Day Adventists, and various others,[1] Respondents, in the Circuit Court for Montgomery County alleging nuisance, trespass, and negligence in connection with the construction of a new parking lot by the Church, which, the Wietzkes claimed, was ultimately the cause of the "repeated and continu[ed] flooding" of their home in Silver Spring, Maryland. The Wietzkes requested some three million dollars in damages against the Church, as well as injunctive relief requiring the Church to "take any and all necessary steps to prevent further flooding of the [Wietzkes'] home as a result of the changed topography, excavation, construction and/or drainage conditions on the Church property."

At the ensuing jury trial, after the close of the Wietzkes' case, the Montgomery County Circuit Court granted the Church's motion for judgment as to the Wietzkes' negligence claim. After the close of the Church's case, but before the jury was instructed, the trial judge, over the Wietzkes' objec-

---

1. After amending their initial complaint, the Wietzkes proceeded against the Chesapeake Conference Association of Seventh–Day Adventists, the Chesapeake Conference of Seventh–Day Adventists, Columbia Excavating Co., Inc., and Devona Malcolm, who apparently was the project manager for the Church's construction project. At the end of trial, but before the jury was instructed, the Wietzkes entered into a stipulation to dismiss with prejudice Columbia Excavating Co. from the lawsuit. For the sake of brevity, we shall refer to the remaining co-defendants together as "the Church."

tions, denied several of the Wietzkes' requested jury instructions: one requested, but denied, jury instruction would have directed the jury that interference with the comfortable enjoyment of the affected property was the only consideration; another rejected instruction would have admonished the jury that Montgomery County's approval of the Church's construction project was not a defense to the Wietzkes' claim for private nuisance; yet another rejected instruction would have advised the jury that the existence of other contributing sources to a nuisance was not a defense to an offending landowner's own contribution to the same nuisance.

Thereafter, the jury found in favor of the Church on nuisance and trespass, and judgment was entered. The Court of Special Appeals affirmed in an unreported opinion, and we granted certiorari, *Wietzke v. The Chesapeake Conference Ass'n*, 417 Md. 501, 10 A.3d 1180 (2011), to answer the following questions:

1. Do Maryland Pattern Jury Instructions 20:1 and 20:2, which fail to include any reference to strict liability, but instead require a finding of "unreasonable conduct", conflict with the Maryland law of strict liability nuisance established by the Maryland Court of Appeals?

2. Were the Wietzkes improperly denied a jury instruction which reflected the strict liability law of nuisance in Maryland when the instructions given by the Court completely failed to address strict liability?

3. Were the Wietzkes improperly denied a jury instruction reflecting Maryland law that County approval does not absolve a Defendant of nuisance liability?

4. Were the Wietzkes improperly denied a jury instruction reflecting Maryland law that a Defendant is not absolved of nuisance liability merely because other sources may have contributed to the nuisance?

5. Did the trial court err in dismissing the negligence count when the evidence established that the Defendants violated, and were given notices of violations, of Montgom-

ery County Code ordinances as a result of the flooding of the Wietzke property?

We shall hold that the doctrine of private nuisance dictates that the fact finder should consider the reasonableness of the offending landowner's use of its property, and that the jury instructions in issue were, then, a correct exposition of the law. We shall further hold that, because the Church did not raise County approval of its construction project as a defense to the Wietzkes' nuisance claim, the Wietzkes' requested jury instruction was not generated by the evidence adduced at trial. Similarly, we shall hold that, because the Church did not introduce evidence that other sources "contributed" to the conditions on the Wietzkes' property as a defense to the Wietzkes' nuisance claim, the Wietzkes' requested jury instruction regarding other sources was inapplicable. Finally, we shall hold that the trial judge erred in granting the Church's motion for judgment on the Wietzkes' negligence claim.

Testimony adduced at trial reflected the following:

The Church and the Wietzkes owned two adjacent properties in Silver Spring, Maryland. The Wietzkes' property sits at the corner of Mill Grove Place and Magnolia Street, while the Church's property is situated at the corner of Timber Ridge Road and Magnolia Street. A topographical map establishes that the properties are situated together such that the Wietzkes' property sits at the bottom of a hill and the Church's property sits atop a hill.

In 2000, the Church made the decision to construct a new parking lot on its property, though construction did not begin immediately. On March 4, 2004, the Church sent correspondence to all neighboring, downstream property owners, including the Wietzkes, informing them it intended to develop its property and employ a "stormwater management" concept to deal with any increased runoff the construction may cause. The letter invited neighboring landowners to provide comments and concerns to the Montgomery County Government. Though some neighbors responded, the Wietzkes did not.

The Church, in conjunction with the construction of the parking lot, developed a stormwater runoff and sediment control strategy, which was intended to control the flow of surface water from the Church property. On October 26, 2006, the Church held a pre-construction meeting, which was attended by a team of engineers, contractors, excavators and sediment control experts, and the stormwater and sediment control concept was discussed at length. Moreover, a large portion of the pre-construction meeting focused on the placement of certain limitations on how much earth could be disturbed during the construction of the parking lot.

Thereafter, between October 26, 2006 and mid-to-late summer of 2007, a large stormwater pond was constructed on the Church's property. The stormwater pond, which held thousands of gallons of water, was designed to collect excess water runoff from the Church's property to release it in a slow, controlled manner. Moreover, the stormwater pond was designed to filter solid matter out of the water by guiding it through a "silt fence" made of woven fabric. Also, to maintain the purity of the stormwater on the Church's construction site, earth dikes, or trenches fashioned out of dirt, were dug to direct stormwater around the construction site.

On two occasions, once on November 28, 2006, and once on June 14, 2007, the Church was visited by a County Inspector and issued a "Notice of Violation" for being in non-compliance with certain County ordinances relating to stormwater and sediment control. The November 28, 2006 Notice, issued pursuant to Section 19–7 of the Montgomery County Code,[2]

---

2. Section 19–7 of the Montgomery County Code provides in pertinent part:

In granting any permit, the director may attach the conditions that the director deems reasonably necessary to prevent sedimentation to public or private property or any sewer, storm drain, or watercourse, to prevent the operation from being conducted in a manner hazardous to life or property, or in a manner likely to create a nuisance. Those conditions may include the erection or installation of walls, drains, dams and structures, plantings, erosion and sediment control measures or devices, furnishing necessary easements and a specified method of performing the work. These items must be identified on

was issued because the Church had not yet built an earth dike and other sediment controls. The November 28, 2006 Notice itself provided:

The site is out of compliance due to the sequence of construction not being followed. Install the earth dike and other sediment controls listed and call for an inspection.

The November 28, 2006 Notice was accompanied by an "Inspection Summary," which instructed the church to cease construction until it built an earth dike:

Inspection this date reveals the following:

1) The site is out of sequence for construction. A notice of violation is being issued.

2) Install the earth dikes per sequence of construction.

3) Bring the site into compliance and call for inspections per the sequence of construction and preconstruction memo.

4) If any changes are wanted, first contact the inspector and your engineer.

The second Notice, dated June 14, 2007, issued pursuant to Section 19–16(a) of the Montgomery County Code,[3] was issued

---

the sediment control plan submitted for approval. A permit must not be issued until an erosion and sediment control plan is approved by the department and the district, and the owner certifies that all land-disturbing activities will be performed pursuant to the erosion and sediment control plan.

3. Section 19–16(a) of the Montgomery County Code provides:

A person must not engage in any land-disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material, to be deposited upon or to roll, flow, or wash upon or over the premises of another in a manner to cause damage to the premises without the express written consent of the owner of the premises affected. A person must not engage in any land-disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material to be deposited to roll, flow, or wash upon or over any public street, streetimprovement, road, sewer, storm drain, watercourse, right-of-way, or any public property in a manner to damage or to interfere with the use of that property. Section 19–1(15) of the Montgomery County Code defines "land-disturbing activity" as "[a]ny earth movement and land changes which may result in soil erosion from water or wind or the movement of sediments into state waters or onto lands in the state, including tilling,

after an usually heavy rainfall, when stormwater had escaped from the earth dikes into the Church's construction site, permitting soil to be washed away. The June 14, 2007 Notice contained a brief narrative, which provided:

Sediment left the site after a storm event. There was flooding in the neighborhood. Contact your engineer for a Solution.

The June 14, 2007 Notice was also accompanied by an Inspection Summary, which stated "there was flooding of the house," without identifying any specific property:

Inspection this date reveals the following:

1) A rainfall event last evening caused sediment to leave the site. The clean water diversion worked but there were wash outs on the private roadway below the site.

2) The water built up on the super silt fence and because of the head pressure of the water caused the water to be forced under the fence.

3) There was sediment water and deposition on the property below. There was flooding of the house.

4) The site is not in sequence with the plans. The parking lot area was cleared earlier and some of the area was to receive excess dirt from the pond. The dirt is now being hauled off. Complete the remaining removal of dirt (the dewatering device and riser are installed[) ]. Stabilize and install the safety fence. Call for inspection of the sediment basin.

5) A notice of violation and a civil citation are being issued.

During the Wietzkes' case, the Wietzkes themselves testified that they had experienced three major flooding events in their basement, which they used as a family room, one in June of 2006, one in November 2006, and one in June of 2007. The Wietzkes also testified that they had experienced somewhere between forty to fifty more minor flooding events in their

---

clearing, grading, excavating, stripping, stockpiling, filling and related activities, and the covering of land surfaces with an impermeable material."

basement during the same time period. Due to the flooding, the Wietzkes testified that they had ceased using their basement entirely.

The Wietzkes produced no expert testimony. Rather, apparently in an attempt to link the Church's construction of the parking lot with the flooding in their basement, the Wietzkes themselves, as well as two neighbors, gave testimony that, based on their perception, water appeared to flow towards the Wietzkes' property from the portion of the Church's property which abutted Magnolia Drive. James Jamison, one of the Wietzkes' neighbors, shot video footage of the June 2007 flooding of the Wietzkes' house, which they charged came from the Church.

The Wietzkes also called Devona Malcolm, a contractor the Church had hired to oversee the building of the new parking lot. Ms. Malcolm admitted that the Church's construction project increased runoff from the Church property, but that the Church had installed a stormwater pond to control it. She also testified that the Church had considered whether it would be beneficial to utilize sandbags during a heavy rainfall, but before action could be taken, the rain had stopped. Moreover, Ms. Malcolm testified that the Church had inquired into whether they could install a permanent concrete curb on their property, but that the County never issued the proper permit.

At the close of the Wietzkes' case, the Church moved for judgment on both the Wietzkes' negligence and trespass claims. The trial judge granted the Church's motion as to the negligence count, explaining as follows:

[W]ith regard to the negligence count, there is evidence that there were citations read in (unintelligible) alleged violations in connection with the sediment and control plan and so forth during the construction. But in order for negligence, or in order for a violation of the statute to be evidence of negligence you would have to show that the statute was designed to prevent the type of harm that, you know, ultimately occurred, and, and here we don't have that, and there's no proof, at this point, that the specific alleged

violation was the cause of water flooding the basement. So, without that evidence, we're back to the standard (unintelligible) of negligence and the duty of the breach and the injury and the cause, and there's not been testimony with regard to a duty.[4]   And it seems to me that the negligence you're talking about would have to do with the construction and whether appropriate methods were or were not employed and that that would be the subject of expert testimony to establish a duty and a breach of a duty, and I don't think that that's been done.

The trial judge denied the Church's motion for judgment as to the trespass count, reasoning that, contrary to the Church's argument, the evidence showed that the Church exercised dominion and control over their property:

I'll deny the motion with regard to the other counts, because I think it's different from a supplier of gasoline to a facility here.   There was active involvement on the property, on the premises, of the defendants, that they did exercise certain control over the property, and I think, at least at this point looking at it in the light most favorable to the plaintiff, there is evidence from which the jury could find for the plaintiff with regard to those other counts.

The Church presented a case rife with expert testimony. Thomas Wheadon, a sediment control and stormwater management specialist, testified that the Church had employed an effective concept for managing stormwater runoff.

Thomas Woodhouse, the County Inspector issuing the November 28, 2006 and June 14, 2007 Notices to the Church, and stormwater expert, testified that, in his opinion, the November 28, 2006 sequencing violation would not have increased surface water flow from the Church property onto the Wietzke property, and that when he issued the Notice, the Wietzkes' property was not "a thought in [his] mind." Further, Mr.

---

**4.**  Prior to trial, the trial judge granted one of the Church's motions *in limine* in part, precluding the Wietzkes themselves, and other lay witnesses, from testifying as to the standard of care the Church owed during the construction.

Woodhouse testified that when he issued the June 14, 2007 Notice to the Church, he did not determine whether water or sediment from the Church's property had reached the Wietzkes' home. Mr. Woodhouse also reviewed the videotape made by Mr. Jamison and concluded that the water flowing onto the Wietzkes' property originated from more than one direction.

The Church also called David O'Bryan, an expert in the areas of civil-engineering, land-use planning, and stormwater management. Mr. O'Bryan testified that, after visiting and observing the Church's property, the construction of the new parking lot did not cause water to flow "where it wasn't previously flowing." Mr. O'Bryan also testified that, based on his review of Mr. Jamison's videotape and a topography map, the surface water flowing onto the Wietzkes' property most likely originated from multiple properties, but that it was impossible to determine which properties in particular without a detailed runoff study. Moreover, Alan Beal, a real estate construction specialist, testified that he recommended the Wietzkes regrade their property and improve the drainage system to control surface waters.

At the close of trial, the parties met with the trial judge regarding their requested jury instructions. The Wietzkes requested several jury instructions relating to their nuisance claim, one of which would have advised the jury that the Church was liable if the Wietzkes' comfortable enjoyment of their property had been interfered with, without more:

> Nuisance is a strict liability cause of action. This means that it does not matter whether or not the nuisance was the result of illegal or negligent conduct. Even if a business is lawful and conducted in the most approved method, it is still a nuisance if it interferes with the comfortable enjoyment by another of his property.

Another of the Wietzkes' requested jury instructions would have advised the jury that County approval of the Church's construction project was not a defense to nuisance liability:

In this case, there has been evidence that the County approved some of the Church's activities. The County approval, however, is not a defense to an action for nuisance. If the Church's activities constituted a nuisance to the Wietzke's, then the Church is liable for that nuisance regardless of any county approval.

Yet another of the Wietzkes' requested jury instructions would have advised the jury that evidence the flood waters at issue came from sources other than the Church was not a defense to nuisance liability:

If water from the Church property contributed to flooding of the Wietzke property, it is not a defense that water from other sources may have also contributed. If you find that the water from the Church property contributed to flooding of the Wietzke property then the Church is liable for any resulting nuisance to the Wietzkes.

The trial judge and counsel met over a two-day period to discuss the proposed instructions,[5] and eventually, the judge denied the Wietzkes' requested jury instructions, opting to instruct the jury in accordance with Sections 20:1, 20:2, and 20:4 of the Maryland Civil Pattern Jury Instructions (4th ed., 2008 Supp.), with specific portions omitted, as noted:[6]

---

5. Prior to instructing the jury, the trial judge recounted the jury instruction process:

[THE COURT]: I want to apologize to you for keeping you waiting this morning. . . . [W]e've actually been working on these instructions since . . . last night . . . after you left, and we've been working on them since 8:30 this morning. . . . I want to compliment counsel for their cooperation in working with me on these, and I think we have perhaps simplified some of these matters for you.

6. The trial court, in delivering the jury instructions, omitted subsections one, two, and four from the Maryland Civil Pattern Jury Instructions § 20:2 (4th ed., 2008 Supp.), apparently, as the Court of Special Appeals noted, "in order to tailor [the pattern instructions] to the evidence" in the case. The omitted portions provide as follows:

Conduct is unreasonable if:
(1) it is motivated by spite or malice; or

A nuisance is any unreasonable conduct which causes real, substantial, and unreasonable damage to, or interference with, another person's ordinary use and enjoyment of his or her property.

Conduct is unreasonable if it is prohibited by law or violated regulations which were adopted to control the use of property, or it is not suitable for the nature of the area and the use being made of other property in the area, or it causes interference with the other person's use and enjoyment and the interference could have been reduced or eliminated without too much hardship or too much expense.

In determining whether the conduct was unreasonable, you should consider whether it was the kind of conduct an ordinary person would expect might interfere with the use and enjoyment of another person's property or cause real and substantial injury to another person's health or comfort. You should also consider the right of both parties to make a reasonable use and enjoyment of their property. The plaintiff's right to be free from interference with his or her use and enjoyment should be balanced against defendant's right to use his or her property. And the plaintiff must expect to endure some inconvenience or discomfort which results from the defendant's reasonable use of his or her property. In determining what reasonable amount of interference, inconvenience, or discomfort the plaintiff should be expected to tolerate you should consider the right of the defendant to use his or her property or to conduct his or her affairs in a reasonable manner. The extent of interference which would result from the defendant's reasonable use of his or her property or conduct of his or her affairs, the circumstances under which the interference occurred, the nature of the area in which the real property is located, and the uses being made of other property in the area.

---

(2) it is for the purpose of interfering with the other person's use and enjoyment of (insert the real property involved); or

\*     \*     \*

(4) it is the type of conduct which is unusually hazardous or dangerous. . . .

A person who creates or continues a nuisance is responsible for the injury or damage caused to others by the nuisance.

The defendants in this case have asserted that the natural flow of water in the neighborhood leads to plaintiff's property. You are instructed that even if the natural flow of water in the neighborhood leads to plaintiff's property, the defendants are liable if they created a change in that water flow which created a nuisance to the Wietzkes.

The jury returned a verdict in favor of the Church on the remaining nuisance and trespass counts, and the verdict sheet provided as follows, regarding the Church's liability:

1. Do you find, by a preponderance of the evidence, that the Defendants are liable to Plaintiffs on their claim of nuisance?

Yes _____                                    No   X

2. Do you find, by a preponderance of the evidence, that the Defendants are liable to Plaintiffs on their claim of trespass?

Yes _____                                    No   X

*If you answered "Yes" to either of the above questions, proceed to questions 3 and 4. If you answered "No" to any of the above questions, your verdict is complete.*

The Wietzkes noted an appeal to the Court of Special Appeals, arguing the same five points they raise before us.[7]

---

**7.** The Wietzkes raised five issues before the Court of Special Appeals, all of which are now before us:

1. Were the Wietzkes improperly denied a jury instruction which reflected the strict liability law of nuisance in Maryland when the instructions given by the Court failed to address strict liability?
2. Do Maryland Pattern Jury Instructions 20:1 and 20:2, which fail to include strict liability, but instead require a finding of "unreasonable conduct", conflict with Maryland nuisance law?
3. Were the Wietzkes improperly denied a jury instruction reflecting Maryland law that County approval does not absolve a Defendant of nuisance liability?
4. Were the Wietzkes improperly denied a jury instruction reflecting Maryland law that a Defendant is not absolved of nuisance liability merely because other sources may have contributed to the nuisance?

The Court of Special Appeals affirmed the judgment, reasoning that as to the nuisance count, "the pattern jury instructions given by the court were a correct statement of, and adequately covered, the law of nuisance as a strict liability cause of action." As to the trial judge's denial of the Wietzkes' county approval instruction, the court reasoned that the record did not reflect that the Church was seeking to defend the action "on the basis that they were in compliance with County mandates," and thus, the Wietzkes' requested instruction was inapplicable. With respect to the Wietzkes' requested "other source" instruction, the court reasoned that the Church "did not contend that other sources absolved them from liability if the existence of a nuisance and causation were otherwise established," likewise rendering the Wietzke's instruction inapplicable. As to the negligence count, the court reasoned that the Wietzkes "introduced no evidence" that the Montgomery County ordinance violated was designed to prevent the type of harm claimed.

In challenging the propriety of the jury instructions on the issue of nuisance, the Wietzkes contended at trial, before the Court of Special Appeals, and now before us, that it was error for the trial judge to instruct the jury to consider the reasonableness of the Church's use of its property. The Wietzkes argue that, because the doctrine of private nuisance is a matter of strict liability, it was irrelevant how the Church used its property if the Wietzkes' use and enjoyment of their property was substantially interfered with. The Wietzkes also have argued that it was error for the trial judge not to instruct the jury to disregard the County's approval of the Church's project or that other sources may have contributed to the Wietzkes' flooding as defenses. To this end, the Wietzkes offered the following instruction in lieu of that which was given:

5. Did the Court err in dismissing the negligence count when the evidence established that the Defendants had violated, and were given notices of violations, of Montgomery County Code ordinances as a result of the flooding of the Wietzke property?

Nuisance is a strict liability cause of action. This means that it does not matter whether or not the nuisance was the result of illegal or negligent conduct. Even if a business is lawful and conducted in the most approved method, it is still a nuisance if it interferes with the comfortable enjoyment by another of his property.

In this case, there has been evidence that the County approved some of the Church's activities. The County approval, however, is not a defense to an action for nuisance. If the Church's activities constituted a nuisance to the Wietzke's, then the Church is liable for that nuisance regardless of any County approval.

If water from the Church property contributed to flooding of the Wietzke property, it is not a defense that water from other sources may have also contributed. If you find that the water from the Church property contributed to flooding of the Wietzke property then the Church is liable for any resulting nuisance to the Wietzkes.

In essence, the Wietzkes' instructions would have had the jury instructed only as to whether their comfortable use and enjoyment was adversely affected, without any other consideration.

In reviewing the propriety of a jury instruction, we use an abuse of discretion standard. In *Collins v. National Railroad Passenger Corp.*, 417 Md. 217, 9 A.3d 56 (2010), we explained that, "[a] trial judge exercises discretion by assessing whether the evidence produced at trial warrants a particular instruction on legal principles applicable to that evidence and to the theories of the parties." *Id.* at 228, 9 A.3d at 63. To succeed on a claim that a trial judge abused his or her discretion in denying a party's requested jury instructions, we determined that three criteria must be met:

(1) the requested jury instruction must be a correct exposition of the law;

(2) the particular law must have been applicable to the evidence before the jury; and

(3) the substance of the requested instruction must not have been fairly covered by the instructions actually given.

*Id.* at 229, 9 A.3d at 63 (citations omitted).

The Wietzkes' first two certiorari questions espouse separate, but inextricably linked, legal conclusions, that only the level of interference to an affected landowner can be considered in assessing a nuisance claim and that strict liability must be imposed once the nuisance is established. As a result, we will address the first two questions together in our initial discussion of the nuisance doctrine.

The Wietzkes' first instruction equated nuisance with a determination of whether the Wietzkes' "comfortable enjoyment" of their property was interfered with:

Nuisance is a strict liability cause of action. This means that it does not matter whether or not the nuisance was the result of illegal or negligent conduct. Even if a business is lawful and conducted in the most approved method, it is still a nuisance if it interferes with the comfortable enjoyment by another of his property.

In contrast, the trial judge's instruction involved a much more comprehensive inquiry, in which the use of its property by the alleged offender must be balanced against the right of the affected landowner to be free from interference:

A nuisance is any unreasonable conduct which causes real, substantial, and unreasonable damage to, or interference with, another person's ordinary use and enjoyment of his or her property.

Conduct is unreasonable if it is prohibited by law or violated regulations which were adopted to control the use of property, or it is not suitable for the nature of the area and the use being made of other property in the area, or it causes interference with the other person's use and enjoyment and the interference could have been reduced or eliminated without too much hardship or too much expense.

In determining whether the conduct was unreasonable you should consider whether it was the kind of conduct an ordinary person would expect might interfere with the use

and enjoyment of another person's property, or cause real and substantial injury to another person's health or comfort. You should also consider the right of both parties to make a reasonable use and enjoyment of their property. The plaintiff's right to be free from interference with his or her use and enjoyment should be balanced against defendant's right to use his or her property. And the plaintiff must expect to endure some inconvenience or discomfort which results from the defendant's reasonable use of his or her property.

In determining what reasonable amount of interference, inconvenience, or discomfort the plaintiff should be expected to tolerate you should consider the right of the defendant to use his or her property or to conduct his or her affairs in a reasonable manner. The extent of interference which would result from the defendant's reasonable use of his or her property or conduct of his or her affairs, the circumstances under which the interference occurred, the nature of the area in which the real property is located, and the uses being made of other property in the area.

A person who creates or continues a nuisance is responsible for the injury or damage caused to others by the nuisance.

The defendants in this case have asserted that the natural flow of water in the neighborhood leads to plaintiff's property. You are instructed that even if the natural flow of water in the neighborhood leads to plaintiff's property, the defendants are liable if they created a change in that water flow which created a nuisance to the Wietzkes.

Whether the trial judge gave a correct exposition of the law of nuisance is the issue.

Nuisance is "one of the most ancient concepts in the Anglo–American common law," existing at least as far back as 1066 A.D. David A. Thomas, Thompson on Real Property § 67.01, at 111 (2d ed., 2010 Supp.). The doctrine was originally conceived to protect private landholders from being dispossessed of their property. *Id.* As the doctrine of nuisance evolved, however, it also became one of the primary tools for protecting private landholders against "substantial interfer-

ences" with their possession of the land. Importantly, the claim is "phrased as a harm or nuisance to the land" itself, not as a harm to the individual landholder. *Id.* Nuisance, then, is somewhat of a hybrid cause of action, involving property tenets, as well as tort principles.

Since its inception, moreover, the doctrine of nuisance has evolved to protect the property rights of the public as well, where a "right common to the general public" has been interfered with. Thomas, § 67.02, at 113. Regarding the distinction between a public and private nuisance, we have explained that "public nuisance is an injury to the public at large or to all persons who come in contact with it," while "private nuisance is an injury to an individual or a limited number of individuals only." *Adams v. Commissioners of Trappe,* 204 Md. 165, 170, 102 A.2d 830, 834 (1954). Thus, while the same activity may give rise to both a public and a private nuisance, the difference is in whether the property rights affected are either confined to private ownership or are cast broadly across the general public:

> A livestock feed lot or a refinery may produce pests or odors over such a wide area that the rights of the general public are affected and, at the same time, nearby private landowners may suffer extraordinary interference with the use and enjoyment of their own lands.

Thomas, § 67.02(a), at 114. Because the case before us involves interference with only the Wietzkes' use and enjoyment of their own private property, we hereafter confine our analysis to private nuisance, which we have defined as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 80, 642 A.2d 180, 190 (1994), quoting Section 821D of the Restatement (Second) of Torts (1965).

The universe of private nuisance is split into a further dichotomy, nuisances *per se* and nuisances in-fact. *See* Thomas, § 67.03, at 117. A nuisance *per se,* or a nuisance at law, involves the use of one's land, which is "so unreasonable," that it is deemed to constitute an actionable nuisance "at all times

and under any circumstances." *Id.; Leatherbury v. Gaylord Fuel Corp.*, 276 Md. 367, 377, 347 A.2d 826, 832 (1975) ("To constitute a nuisance per se, the activity sought to be enjoined must be a nuisance 'at all times and under any circumstances regardless of location or surroundings.'" (quoting *Commissioners of Trappe*, 204 Md. at 170, 102 A.2d at 834)). Such nuisances are typically found only where a particular land use is "motivated by malice toward the plaintiff landowner," is "forbidden by law," or is "flagrantly contrary to generally accepted standards of conduct." Thomas, § 67.03(a), at 118; *Commissioners of Trappe*, 204 Md. at 175, 102 A.2d at 836 ("to engage in any form of business in defiance of laws regulating or prohibiting [a] business constitutes a nuisance *per se*"); *State use of Bohon v. Feldstein*, 207 Md. 20, 34, 113 A.2d 100, 106 (1955) (explaining that it is a nuisance *per se* if "the thing itself" works "some unlawful peril to health or safety of person or property." (quoting *Sherwood Bros., Inc. v. Eckard*, 204 Md. 485, 494, 105 A.2d 207, 211 (1954))); *see, e.g., Patapsco Electric Co. v. Mayor and City Council of Baltimore City*, 110 Md. 306, 312, 72 A. 1039, 1041–1042 (1909) (concluding that the City of Baltimore could seek an injunction against a power company from operating on city property because the company had not yet received the required consent from the Mayor and City Council).

Nuisances in-fact, or nuisances *per accidens*,[8] arise where, considering the "particular setting" and surrounding circumstances, a particular land use constitutes a nuisance even though "the conduct might not be a nuisance in another locality or at another time or under some other circumstances." Thomas, § 67.03(b), at 124; *Commissioners of Trappe*, 204 Md. at 170, 102 A.2d at 834 ("A nuisance in fact is an act, occupation, or structure, not a nuisance *per se*, but one which becomes a nuisance by reason of the circumstances, location, or surroundings."). As early as 1879, we had occa-

---

8. In *Adams v. Commissioners of Trappe*, 204 Md. 165, 170, 102 A.2d 830, 834 (1954), we recognized that nuisances are "classified as nuisances *per se* and nuisances in fact, or *per accidens*."

sion to consider the issue of nuisance in fact in *Dittman & Berger v. Repp*, 50 Md. 516 (1879), in which we determined that the maintenance of loud and vibratory beer brewing devices created a private nuisance sufficient to justify the issuance of an injunction. We explained that, in order to be actionable, a nuisance must be one which "in view of the *circumstances* of the case, is *unreasonable* and in derogation of the rights of the complainant." 50 Md. at 522 (emphasis added). We ordained that consideration of the circumstances of a given nuisance claim necessarily involved a review of "the locality, the nature of the trade, the character of the machinery, and the manner of using the property producing the annoyance and injury complained of." *Id.; see also Hendrickson v. Standard Oil Co.*, 126 Md. 577, 588, 95 A. 153, 157 (1915) ("The facts of each case must determine the question whether a nuisance exists against which a neighboring proprietor is justly and reasonably entitled to call upon a Court of equity" for relief).

In *Short v. Baltimore City Passenger Railway Company*, 50 Md. 73 (1878), we considered a private nuisance claim, such as that brought in the instant case, brought against a commercial railroad where, after clearing its tracks of snow, the railroad had allegedly created a large snow ridge that reportedly concentrated the flow of surface waters onto a nearby property. We were asked to determine whether it was error for the trial judge to instruct the jury to consider the reasonableness of the railroad's use of its property in finding whether the railroad had created an actionable nuisance. In framing our analysis, we explained that the nuisance inquiry necessarily involved the balancing of conflicting property rights, and to that end, a determination of whether the offending landowner's use of its own property was "reasonable, usual, and proper":

> As a general rule, it is conceded that every one must so use his own property and exercise the rights incident thereto, in such a manner as not to injure the property of another. And it is equally true, that the *mere lawfulness of the act* is not in itself a test in all cases, of exemption from liability for

injuries resulting therefrom to the property of others. But yet, there are certain rights incident to the dominion and ownership of property, in the exercise and enjoyment of which a person will not be liable for damages, although injury may be occasioned thereby to the property of another.... The question then is, what is the true test in actions of this kind, by which the *exemption from liability is to be determined?* We think it may be safely said, both on principle and on authority, that the true test is, whether in the act complained of, the owner has used his property in *a reasonable, usual and proper manner,* taking care to avoid unnecessary injury to others.

*Short,* 50 Md. at 81–82. We affirmed on the basis that the trial court's instructions had correctly admonished the jury to consider the reasonableness of the railroad's use of its property.

In other late nineteenth century cases, we had occasion to flirt with discussing only the unreasonableness of the interference caused to the affected landowner's use and enjoyment as a basis for relief, but never expressly adopted a view consistent with that doctrine nor deflected one that balanced reasonable use versus unreasonable interference as adopted in *Short.* To illustrate, in *Adams v. Michael,* 38 Md. 123 (1873), we were asked to determine whether a petition to prospectively enjoin the construction of a felt-roofing facility in close proximity to a group of residential tenements was erroneously dismissed. We framed the nuisance analysis as one focusing solely on whether the activity complained of would interfere with "the ordinary comfort of human existence":

[W]hether it be smoke, smell, noise, vapors, or water, or any gas or fluid ... [t]he owner of one tenement cannot cause or permit to pass over, or flow into his neighbor's tenement, any one or more of these things in such a way as materially to interfere with the ordinary comfort of the occupier of the neighboring tenement, or so as to injure his property.... The real question in all the cases is the question of fact, viz: whether the annoyance is such as materially to interfere with the ordinary comfort of human existence?

*Id.* at 127–28. (internal quotation marks omitted). Also, in both *Dittman,* 50 Md. at 516, and *Woodyear v. Schaefer,* 57 Md. 1 (1881), we dealt with questions relating to the propriety of granting injunctions to restrain the maintenance of nuisances and applied the framework set forth in *Adams.* In this regard, see Robert G. Bone, *Normative Theory and Legal Doctrine in American Nuisance Law: 1850 to 1920,* 59 S. Cal. L.Rev. 1101, 1184 (1986).

Our opinion in *Susquehanna Fertilizer Company v. Malone,* 73 Md. 268, 280, 20 A. 900, 902 (1890), however, embraces the balance of use against interference test. In *Susquehanna Fertilizer Company,* in the context of a commercial fertilizer company's alleged creation of overwhelming and offensive odors, we suggested that the concept of reasonable use of property by the alleged offender was essential to the discussion of nuisance in fact. Thus, we advised that not all inconveniences to surrounding landowners would justify limiting the reasonable use of the offending landowner's property:

> [I]n actions of this kind, the law does not regard trifling inconveniences.... [I]n determining the question of nuisance in such cases, the locality and all the surrounding circumstances should be taken into consideration; and that where expensive works have been erected and carried on, which are useful and needful to the public, persons must not stand on extreme rights, and bring actions in respect of every trifling annoyance, otherwise, business could not be carried on in such places. [I]f the result of the trade or business thus carried on is such as to interfere with the physical comfort, by another, of his property, or such as to occasion substantial injury to the property itself, there is wrong to the neighboring owner for which an action will lie.

*Id.* at 280, 20 A. at 902.

In more modern nuisance in-fact cases, we also have balanced the competing rights of landowners. In *Evans v. Burruss,* 401 Md. 586, 933 A.2d 872 (2007), an affected landowner discovered that a neighbor had received a building permit to construct four amateur radio towers on his property,

only after contractors showed up and began developing the neighbor's land. Unavailingly, the affected landowner requested a stop work order from the Montgomery County Department of Permit Services. Thereafter, the affected landowner lost two appeals before the Board of Appeals and the Circuit Court for Montgomery County on the basis that the appeals were untimely. We were asked to determine whether the affected landowner had a due process right to be given actual notice that his neighbor had been issued a building permit. In our analysis, we discussed the competing property rights of adjoining landowners, significantly characterizing the doctrine of private nuisance as one which "balance[d] the conflicting rights of landowners." *Id.* at 610, 933 A.2d at 886, quoting *Prah v. Maretti,* 108 Wis.2d 223, 321 N.W.2d 182, 187 (1982). In the brief discussion, we determined that because private nuisances existed "independently of the issuance of any public permits," they were "not a normal element of rights arising out of the issuance of building permits." *Id.* at 610, 933 A.2d at 886.

In *Battisto v. Perkins,* 210 Md. 542, 124 A.2d 288 (1956), we addressed the flow of surface waters from an offending landowner's property to that of a neighboring property in the context of a claim for private nuisance. Specifically, we considered whether the trial court had erroneously directed a verdict for the offending landowner. The affected landowner alleged that, by "grading, bulldozing and building" new homes on a nearby property, the offending landowner had accelerated "large quantities of mud and debris" upon the property of the affected landowner, and had thus created a nuisance. We framed our analysis by establishing that, due to the competing property interests at stake, a court in equity was obliged to balance the benefit versus the harm caused by an offending landowner's use of its property, leaving the question of whether the offending landowner had used his or her property reasonably to the jury:

> [A]n upper owner has the right to have surface waters flow naturally over the lands of lower owners, according to the civil law doctrine adopted in Maryland and a number of

other states. [We have] adopted and applied the rule, known as "reasonableness of use" involving a balance of benefit and harm.... The Maryland cases make it clear that the upper owner cannot, with impunity, artificially increase or concentrate the natural flow. The rule applies to urban as well as rural lands.... [The offending landowner] had a right to improve their property and prepare it for the erection of houses, but it was entirely foreseeable that the removal of all ground cover might increase the runoff and cause damage to the lower owners, and we think the upper owners were under a duty to use reasonable precautions against harm. What would be reasonable is ordinarily a question for the jury.

*Id.* at 546, 124 A.2d at 290 (citation omitted). Thus, the balance of use and interference was joined.

We reiterated that the reasonableness of the offending landowner's use of his or her land was a matter for the fact-finder in yet another surface water case, *Slaird v. Klewers,* 260 Md. 2, 271 A.2d 345 (1970). In *Slaird,* we considered whether the trial judge had erroneously denied a landowner's nuisance claim, which arose in part from the alleged increased flow of surface waters originating from a neighboring property. The affected landowner claimed that their neighbor's installation of a swimming pool "changed the elevation and sloping" of the land such that chlorinated surface water flowed unrestrained into their yard. In affirming the dismissal, we determined that the judge had appropriately considered the reasonableness of the offending landowner's use and development of their land:

In regard to the alleged change of grade and increased flow of surface and other water on the Slaird property, the testimony was conflicting but there was substantial testimony to support the Chancellor's conclusion that this condition, if it existed at all, was not caused by the construction of the swimming pool, which was done in accordance with the requirements of the Montgomery County Code and with full compliance with the recommendations of the building inspector. The Chancellor, himself, with the consent of coun-

sel for both parties and accompanied by them, visited the site after a heavy rain, as we have noted, and observed that the drainage problem "is not acute today."

*Id.* at 10–11, 271 A.2d at 349.

We will not disturb a trial judge's decision to deny a litigant's requested jury instructions if the instruction given is a correct exposition of the law. *Collins,* 417 Md. at 228–229, 9 A.3d at 63. In the present surface water case, the trial judge, in accordance with our jurisprudence, properly instructed the jury that they should consider the reasonableness of the offending landowner's use of its property, the locality of the affected landowner's property, the surrounding circumstances, and the substantiality of the interference with the Wietzkes' use and enjoyment of their property. Conversely, the Wietzkes' formulation of nuisance would have erroneously directed the jury to consider only whether the Wietzkes' "comfortable enjoyment" of their property experienced interference. Therefore, the trial judge correctly instructed the jury regarding the elements of nuisance.[9]

In order to obviate our holding, however, the Wietzkes rely on *Washington Suburban Sanitary Comm'n v. CAE–Link Corp.,* 330 Md. 115, 622 A.2d 745 (1993), and argue that, in that case, we substantially revised the law of nuisance in Maryland by prohibiting a trier of fact from considering the reasonableness of an offending landowner's conduct in arriving

---

**9.** We believe a part of the difficulty that the Wietzkes experience with the jury instruction given is with the inclusion of the word "conduct" in the first two paragraphs of the jury instructions in which the concept of nuisance is introduced. Although the word "conduct" is an unfortunate addition to the nuisance pattern jury instructions, the gravamen of the instruction includes the balancing of use principles that our jurisprudence embraces. As the Court of Special Appeals noted:

[The Wietzkes'] arguments highlight language in the pattern instructions that we believe could be improved. We suggest that the Maryland State Bar Association Standing Committee on Pattern Jury Instructions review the instructions in question and consider a revision.

*Wietzke, et ux. v. Chesapeake Conference Assoc. of Seventh–Day Adventists, et al.,* No. 1070, Sept. Term, 2009, at 40 (Filed September 24, 2010).

at its verdict on nuisance in fact. In that case, the Washington Suburban Sanitary Commission built and operated a sewage sludge facility, and as a part of its day to day operations, would receive shipments of sewage sludge, mix the sludge with wood chips, divide the mixture into "composting piles," and essentially let the piles ferment for some fifty-one days. Though the Commission utilized a "vacuum blower" system to control the smells emitted, the sewage facility created a radius of "noxious odors" which could be detected on nearby properties. *Electro–Nucleonics, Inc. v. Washington Suburban Sanitary Comm'n,* 315 Md. 361, 378, 554 A.2d 804, 812 (1989), *cited in CAE–Link Corp.,* 330 Md. at 119 n. 2, 622 A.2d at 747 n. 2. The question before us was whether negligence had to be proven in order to submit a nuisance claim to the jury. This question was generated by the Circuit Court's grant of partial summary judgment on the affected landowner's nuisance claim, which required a showing that the Commission had negligently operated the sewage sludge facility.

At trial, the affected landowners failed to establish a *prima facie* showing of negligence, and the trial court granted the Commission's motion for judgment. We framed our analysis by explaining that a nuisance claim did not depend upon proof of negligence of an offending landowner:

> [N]uisance focuses not on the possible negligence of the defendant but on whether there has been *unreasonable interference* with the plaintiff's use and enjoyment of his or her own property. To prove the existence of a nuisance, therefore, the complained of interference must cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes and habits; it must interfere seriously with the ordinary comfort and enjoyment of the property.

*CAE–Link Corp.,* 330 Md. at 126, 622 A.2d at 750 (emphasis added) (internal citations omitted). We concluded that, because the creation of a nuisance resulted in strict liability, making out a *prima facie* case of nuisance did not require a showing that the Commission had been negligent. In so doing, however, we did not dramatically revise our nuisance jurisprudence, as the Wietzkes' have argued, such that the

finding of a private nuisance no longer involves a balance of the competing property interests at stake.

We also perceive little merit in the Wietzkes' argument that the concept of "strict liability" was not fairly covered by the trial judge's instructions. Strict liability is defined as:

Liability that does not depend on actual negligence or intent to harm, but that is based on the breach of an absolute duty to make something safe.

Black's Law Dictionary 998 (9th ed.2009). In the present case, the concept of strict liability was articulated, correctly, in the trial judge's instruction that,

A person who creates or continues a nuisance is responsible for the injury or damage caused to others by the nuisance.

The [Church has] asserted that the natural flow of water in the neighborhood leads to [Wietzkes'] property. You are instructed that even if the natural flow of water in the neighborhood leads to [the Wietzkes'] property, the [Church is] liable if they created a change in that water flow which created a nuisance to the Wietzkes.

The jury, therefore, was correctly instructed as to strict liability.

■ The Wietzkes next allege that the trial judge abused his discretion by failing to instruct the jury that County approval of the Church's construction project did not absolve the Church of liability for creating a nuisance. The Wietzkes' instruction provided:

In this case, there has been evidence that the County approved some of the Church's activities. The County approval, however, is not a defense to an action for nuisance. If the Church's activities constituted a nuisance to the Wietzkes', the Church is liable for that nuisance regardless of any county approval.

The Wietzkes argue that the "linchpin" of the Church's defense was the testimony of "a plan reviewer and a plan inspector" from the Montgomery County government "who praised the Church for its compliance with the County's

'approved' plan." The Church responds that they were not defending on the ground that they had complied with County requirements, in and of itself, but on the grounds that they had developed and executed an exacting strategy for controlling stormwater runoff.

Even if a requested jury instruction is a correct exposition of the law, a trial judge should incorporate it only where it is generated by the evidence before the jury, and not already fairly covered by the instructions given. *Collins,* 417 Md. at 229, 9 A.3d at 63. In the present case, it is clear that the Church introduced evidence that surface water runoff was a serious consideration in its construction of a new parking lot. As initially set forth in their pretrial statement, the Church's purpose in introducing testimony of a County plan reviewer was to provide a basis for their claim that they had come up with an effective strategy to "ease water flow impacting [the Wietzkes'] property and other low lying areas," and the County plan reviewer testified that he reviewed the Church's concept specifically to determine whether it "[could] provide sediment control for the proposed disturbed area[, and,] if required, provide stormwater management...." The Church's project manager admitted the parking lot project would increase runoff. Likewise, as elucidated in the Church's opening statement, the purpose for providing testimony of a County Inspector was to illustrate that the Church had actually followed through and executed their strategy to control stormwater runoff:

> When water runs downhill, stormwater management is about controlling the rate of water.... [I]n Montgomery County, the stormwater management [ ] is on the cutting edge.... [B]ecause of Montgomery County's requirements that are so exacting, both on stormwater management and on forestation, reforestation ... this project ended up costing [ ] over $400,000.... [D]uring this entire period of time, the County was monitoring the property because they had a tree save plan, they had a forestation plan going on, and a stormwater management plan. And before you get your

building permit and have your pre-construction meeting, you're not allowed to disturb land.

During closing, the Church summed up their case by asserting that, though the parking lot project increased runoff from their property, they had controlled it effectively:

> We knew there was going to be a larger amount of runoff because we were creating [an] impervious surface. But how do you deal with that runoff? You control it. . . .

Both the Church's theory of the case, and the evidence presented at trial, therefore, were aimed at illustrating the extent of the measures taken by the Church to prevent increased surface water runoff due to the construction of the parking lot. At no time did the Church claim, nor did the evidence give rise to the inference, that County approval, without more, insulated the Church from liability for contributing to a private nuisance. Moreover, the trial judge instructed that

> [a] person who creates or continues a nuisance is responsible for the injury or damage caused to others by the nuisance ... [and the Church is] liable if they created a change in that water flow which created a nuisance to the Wietzkes.

We therefore conclude that the trial judge did not abuse his discretion in rejecting the Wietzkes' proposed "County approval" instruction.

■ The Wietzkes further argue that the trial judge abused his discretion in denying their requested jury instruction that "the [Church was] not absolved of nuisance liability merely because other sources may have contributed to the nuisance." The Wietzkes' instruction provided:

> If water from the Church property contributed to flooding of the Wietzke property, it is not a defense that water from other sources may have also contributed. If you find that the water from the Church property contributed to flooding of the Wietzke property then the Church is liable for any resulting nuisance to the Wietzkes.

The Wietzkes argue that the Church presented expert testimony that water from "other residences contributed to the Wietzke flooding," and thus, sought to defend on the ground that their property was one of many others releasing runoff. The Church, in response, argues they never contended, nor did the evidence tend to establish, that the flow of surface waters from other properties was a defense for the creation of a nuisance, only that, because the natural flow of water ran from high to low, with the Wietzkes' property at the bottom, surface water flowed onto the Wietzkes' property from all directions. The Church also argues that the trial court's instruction fairly covered the relevant law on contributing sources.

In the present case, the Church introduced the testimony of several experts which tended to establish that the Wietzkes' property sat lower topographically than all other nearby properties, and that because of this, water naturally flowed onto the Wietzkes' property from all directions. For instance, a County Inspector and a civil-engineering expert, reviewed the videotape adduced at trial of the June 2007 rainstorm and concluded that, contrary to the Wietzkes' contentions, the water flowing onto their property originated from more than one direction. Similarly, a County employee testified that the Wietzkes' home also sat lower topographically than the neighboring properties. Moreover, a real estate construction specialist testified that he recommended the Wietzkes regrade their property and improve the drainage system to control surface waters. As set forth in the Church's opening statement, the Church's purpose for introducing evidence that surface waters flowed from all directions onto the Wietzkes' property was to establish that the Wietzkes' property sat at the "bottom of [a] hill," and in its natural state, took on surface water from all directions:

> This case is about water running downhill. That's what it's about. Water runs downhill. We all know that.... [T]he law does not require individuals or churches or anybody to stop the water from flowing downhill. If that's the way it goes, and you're living at the bottom of the hill, you might

get flooded. That can happen.... When water runs down-hill, stormwater management is about controlling the rate of water. And there's no one in this case who's going to tell you that the Church was not allowed to have rainwater run downhill from its property. The key is controlling the rate at which that flows.

During closing argument, the Church again summed up their purpose for introducing evidence that the Wietzkes' property received surface water from many directions:

[T]his case is about water running downhill. It's really very simple. And we've stuck to that the whole time. We like that topographical map. And the reason being[,] when it comes right down to it[,] the water's going to flow downhill. The water always has flowed downhill. And that's the history of this whole neighborhood.

Thus, the Church's purpose for introducing evidence of the runoff from other properties was not, as has been contended by the Wietzkes, an attempt to accuse others of participating in the same nuisance. To the contrary, the Church introduced their theory of the case to negate the Wietzkes' claim that the Church's parking lot project increased the flow of surface waters onto the Wietzkes' property.

Moreover, the trial judge instructed that if the Church created any change in water flow, that it would be liable:

The defendants in this case have asserted that the natural flow of water in the neighborhood leads to plaintiff's proper-ty. You are instructed that even if the natural flow of water in the neighborhood leads to [the Wietzkes'] property, the [Church is] liable if they created a change in that water flow which created a nuisance to the Wietzkes.

We therefore conclude that the trial judge properly denied the Wietzkes' proposed "other source" instruction.

■ The Wietzkes also argue that the trial court erred in taking the negligence count away from the jury. Specifically, the Wietzkes dispute the trial judge's conclusion that Section 19–16(a) of the Montgomery County Code, which was cited in a Notice of Violation issued to the Church on June 14, 2007,

was not "designed to prevent the type of harm that . . . ultimately occurred," and that there was no proof that the Church's violation of Section 19–16(a) "was the cause of water flooding the [Wietzkes'] basement." The Church counters that the Wietzkes were not members of any such class of persons protected by Section 19–16(a), and that the testimony of the County Inspector who issued the June 14, 2007 Notice established that the Notice was not issued because the Wietzkes' home was flooded.

A *prima facie* case of negligence may be established by proof that an individual violated an applicable statute or ordinance. *Brooks v. Lewin Realty III, Inc.,* 378 Md. 70, 78–80, 835 A.2d 616, 620–622 (2003). In *Brooks,* Judge John C. Eldridge stated that, in order to place "sufficient evidence" in the record "to warrant the court in submitting the case to the jury on a party's negligence," the plaintiff must show that:

(a) [T]he violation of a statute or ordinance [is] designed to protect a specific class of persons which includes the plaintiff, and

(b) [T]he violation proximately caused the injury complained of.

*Id.* at 79, 835 A.2d at 621, quoting *Crunkilton v. Hook,* 185 Md. 1, 4, 42 A.2d 517, 519 (1945). To make the requisite showing of proximate cause, the claimant must show both that they are "within the class of persons sought to be protected," and that the "harm suffered is of a kind which the drafters intended the statute to prevent." *Brooks,* 378 Md. at 79, 835 A.2d at 621–622 ("It is the existence of this cause and effect relationship that makes the violation of a statute *prima facie* evidence of negligence." (quoting *Brown v. Dermer,* 357 Md. 344, 359, 744 A.2d 47, 55 (2000))). Importantly, we have always required the statute or ordinance allegedly violated to "set forth mandatory acts" that are "clearly for the protection of a *particular* class of persons" and *not* merely for "the public as a whole." *Remsburg v. Montgomery,* 376 Md. 568, 584, 831 A.2d 18, 27 (2003), quoting *Ashburn v. Anne Arundel County,* 306 Md. 617, 635, 510 A.2d 1078, 1087 (1986).

In *Brooks*, 378 Md. at 70, 835 A.2d at 616, we considered whether a landlord's violation of the Baltimore City Housing Code's lead-paint provisions, as established by a child's consumption of loose flakes of lead-paint on a leased premises, was sufficient to establish a *prima facie* case of negligence. We examined the language of the Housing Code and concluded that it imposed numerous duties upon landlords with respect to the tenants to whom they lease, to, one of which was to ensure that any leased premises was entirely free of "interior loose or peeling wall covering or paint":

### § 706. Painting.

* * *

(b) *Interiors.*

(1) All interior loose or peeling wall covering or paint shall be removed and the exposed surface shall be placed in a smooth and sanitary condition.

(2) No paint shall be used for interior painting of any dwelling ... unless the paint is free from any lead pigment.

Baltimore City Code (2000, Supp. II 2002), Art. 13, § 706. We determined that, under the plain language of the Housing Code, it was "clear that the Mayor and City Council of Baltimore mandated a *continuing* duty to keep the dwelling free of flaking, loose, or peeling paint, *at all times* 'while [the dwelling is] in use,' in order for the landlord to remain in compliance with the Housing Code." *Brooks*, 378 Md. at 83–84, 835 A.2d at 624. Because the Housing Code violation was issued for the presence of lead-paint in the leased apartment, we determined that the requisite "cause and effect" relationship existed. We concluded that, because the lead-paint provision was "enacted to prevent lead poisoning in children," and that the injured child was "in the class of people intended to be protected" and "his injury, lead poisoning, [was] the kind of injury intended to be prevented by the Code," the child had established a *prima facie* case sounding in negligence. *Id.* at 89, 835 A.2d at 627.

In the case before us, the Church received two Notices for violating provisions of the Montgomery County Code relating

to erosion, sediment control and stormwater management. The November 28, 2006 Notice, which cited Section 19–7 of the Montgomery County Code, was issued when the County discovered that the Church was out of sequence with its approved construction plan. Section 19–7 of the Montgomery County Code, which sets forth a "sediment control" permitting scheme, provides in pertinent part:

In granting any permit, the director may attach the conditions that the director deems reasonably necessary to prevent sedimentation to public or private property or any sewer, storm drain, or watercourse, to prevent the operation from being conducted in a manner hazardous to life or property, or in a manner likely to create a nuisance. Those conditions may include the erection or installation of walls, drains, dams and structures, plantings, erosion and sediment control measures or devices, furnishing necessary easements and a specified method of performing the work. These items must be identified on the sediment control plan submitted for approval. A permit must not be issued until an erosion and sediment control plan is approved by the department and the district, and the owner certifies that all land-disturbing activities will be performed pursuant to the erosion and sediment control plan. . . .

It is evident from the language of Section 19–7 that the County's permitting scheme was enacted, at least in part, to "prevent sedimentation" on "private property," which would appear to encompass the harm the Wietzkes complain of. The Wietzkes were also required to show, however, that the Church's November 28, 2006 violation caused, at least in part, the flooding of the Wietzkes' basement. The Notice itself is unhelpful in this regard, as it states only that "the site is out of compliance due to the sequence of construction not being followed," and orders the Church to install an "earth dike" and "[o]ther sediment controls." The "Inspection Summary," which accompanied the Notice, is similarly unhelpful, providing only that the Church was required to bring the construction site back into compliance:

Inspection this date reveals the following:

1) The site is out of sequence for construction. A notice of violation is being issued.

2) Install the earth dikes per sequence of construction.

3) Bring the site into compliance and call for inspections per the sequence of construction and preconstruction memo.

4) If any changes are wanted, first contact the inspector and your engineer.

Moreover, the Wietzke's case was silent as to whether the November 28, 2006 Notice was in any way related to the flooding of their basement. To be sure, the Wietzkes adduced evidence that the Church received the Notice, and that the Notice was issued during the same month as one of the Wietzkes' flooding incidents, but they failed to show a "cause and effect relationship" between the Notice and the flooding, *Brooks,* 378 Md. at 79, 835 A.2d at 621, and thus failed to establish a *prima facie* case of negligence as to the November 28, 2006 Notice. We therefore affirm the trial court's ruling as to this particular Notice.

The June 14, 2007 Notice, which cited Section 19–16(a) of the Montgomery County Code, however, was issued under different circumstances. After the County discovered that sediment had actually escaped from the Church's construction site onto the neighboring private property, the County Inspector issued a Notice, which provided:

Sediment left the site after a storm event. There was flooding in the neighborhood. Contact your engineer for a Solution.

The June 14, 2007 Notice was also accompanied by an "Inspection Summary," which, among other details, provided that "[t]here was sediment water and deposition on the property below" and that "[t]here was flooding of the house":

Inspection this date reveals the following:

1) A rainfall event last evening caused sediment to leave the site. The clean water diversion worked but there were wash outs on the private roadway below the site.

2) The water built up on the super silt fence and because of the head pressure of the water caused the water to be forced under the fence.

3) There was sediment water and deposition on the property below. There was flooding of the house.

4) The site is not in sequence with the plans. The parking lot area was cleared earlier and some of the area was to receive excess dirt from the pond. The dirt is now being hauled off. Complete the remaining removal of dirt (the dewatering device and riser are installed[) ]. Stabilize and install the safety fence. Call for inspection of the sediment basin.

5) A notice of violation and a civil citation are being issued.

The ordinance cited in the June 14, 2007 Notice, Section 19–16(a), governs the "roll[ing], flow[ing], or wash[ing]" of sediment from one property "over the premises of another in a manner to cause damage to the premises":

A person must not engage in any land-disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material, to be deposited upon or to roll, flow, or wash upon or over the premises of another in a manner to cause damage to the premises without the express written consent of the owner of the premises affected. A person must not engage in any land-disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material to be deposited to roll, flow, or wash upon or over any public street, streetimprovement, road, sewer, storm drain, watercourse, right-of-way, or any public property in a manner to damage or to interfere with the use of that property.

The language of Section 19–16(a) of the Montgomery County Code prohibits "land-disturbing activity," which causes materials such as "soil, earth, sand, gravel, rock, stone, or other material," from "being deposited upon," or from "roll[ing], flow[ing], or wash[ing] upon or over the premises of another in a manner to cause damage." "Land-disturbing activity" has been defined broadly to encompass "[a]ny earth movement

and land changes which may result in soil erosion from water or wind or the movement of sediments into state waters or onto lands in the state, including tilling, clearing, grading, excavating, stripping, stockpiling, filling and related activities, and the covering of land surfaces with an impermeable material." Montgomery County Code, Section 19–1(15). Thus, in a plain meaning analysis, the ordinance clearly encompasses the type of harm the Wietzkes complain of, the washing of certain "materials" onto their property, and protects a class of persons encompassing the Wietzkes, private landowners in Montgomery County.

Our plain meaning analysis of Section 19–16(a) of the Montgomery County Code is bulwarked by the legislative record. Originally enacted in 1975, part of Section 19–16(a)'s purpose was to prohibit certain "conduct involving land disturbing activities," including those which caused "soil, earth, sand, gravel, rock, stone, or other material, or liquid" from being deposited upon or washing over the "premises of another." 1976 Montgomery County Laws, Chapter 14.[10] In 1986, the word "liquid" was excised from Section 19–16(a)[11] in order to

___

**10.** Section 19–16(a), as originally enacted, included "liquid," and provided:

> No person shall engage in any land disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material, *or liquid* to be deposited upon or to roll, flow, or wash upon or over the premises of another in a manner to cause damage to such premises without the express consent of the owner of such premises affected; no person shall engage in any land disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material *or liquid* to be deposited or to roll, flow, or wash upon or over any public street, street improvement, road, sewer, storm drain, water course, or right-of-way, or any public property in a manner to damage or to interfere with the use of such property.

1976 Montgomery County Laws, Chap. 14, Section 19–16(a) (emphasis added).

**11.** Section 19–16(a), as amended, removed the term "liquid," and provided:

> A person must not engage in any land disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material, to be deposited upon or to roll, flow, or wash upon or

"remove the reference to liquid that does not contain sediment." 1986 Montgomery County Laws, Chapter 45; Summary of Proposed Amendments to Chapter 19, Article I, "Erosion and Sediment Control" (1986). Excising the word liquid, then, was to avoid reference to "pure" liquids, while including reference to liquids that include sediment. Notwithstanding this nuance, the trial court's conclusion that Section 19–16(a) did not protect against the harm the Wietzkes complained of was not supported, as the issue of whether the flood waters in the Wietzkes' basement bore sediment from the Church's property formed no part of the trial judge's discussion in granting the Church's motion for judgment. Moreover, at trial, the Wietzkes presented the following testimony of Ms. Malcolm, who stated that the "private property" referred to in the June 14, 2007 Notice was actually the Wietzkes' property:

[PETITIONER'S COUNSEL]: [T]hat violation was issued the, the day after the Wietzkes had their June 2007 flood, correct?

[MS. MALCOLM]: Correct.

[PETITIONER'S COUNSEL]: [O]ne of the boxes checked there is section 19–16A, correct?

[MS. MALCOLM]: Correct.

[PETITIONER'S COUNSEL]: Okay. And can you read out loud for what it says there for that box that's checked?

[MS. MALCOLM]: "Permitted soil to be deposited on a roadway, permitted soil to flow onto private property, or permitted soil to flow, wash, or to be deposited in a water course."

---

over the premises of another in a manner to cause damage to the premises without the express written consent of the owner of the premises affected. A person must not engage in any land disturbing activity or by any action cause or permit any soil, earth, sand, gravel, rock, stone, or other material to be deposited or to roll, flow, or wash upon or over any public street, street improvement, road, sewer, storm drain, watercourse, right-of-way or any public property in a manner to damage or to interfere with the use of that property.
1986 Montgomery County Laws, Chap. 45, Section 19–16(a).

[PETITIONER'S COUNSEL]: And the private property was the Wietzke property, correct?

[MS. MALCOLM]: Correct.

Because the purpose of Section 19–16(a) of the Montgomery County Code was to prevent liquid containing sediment from being deposited onto the premises of another, which protects the Wietzkes, as members of a particular class, and because, various evidence, if believed and credited by the jury as favorable to the Wietzkes, could have supported a negligence claim, we conclude that the trial court erred in granting the Church's motion for judgment on the Wietzkes' negligence claim, as to the June 14, 2007 Notice, before submitting the case to the jury. As a result, we reverse the judgment of the Circuit Court as to the negligence count, as it related to Section 19–16(a), and we remand for further proceedings on the issue of negligence in accordance with this opinion.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AS TO THE NEGLIGENCE COUNT AND TO REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**